FASTENAL COMPANY,                                    PLAINTIFF,

VS:

GREG CRAWFORD, et al,                                DEFENDANTS.

**DEFENDANTS GREG CRAWFORD, TODD ROBINSON, ERIC MILLER, AND TRISTATE INDUSTRIAL SUPPLY'S BRIEF IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW, AND/OR MOTION FOR JUDGMENT NOT WITHSTANDING THE VERDICT OR PLEADING IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL AND/OR REMITTITUR**

Come now the Defendants, Greg Crawford, Todd Robinson, Eric Miller, and Tristate Industrial Supply, by and through counsel, and submit this brief in support of their Motions for Judgment as a matter of law, Judgment notwithstanding the verdict, or in the alternative for a new trial and/or remittitur pursuant to <u>FRCP Rule 59</u>, <u>FRCP Rule 50a and 50b</u>.

<u>FRCP Rule 50:</u>

If a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on that issue, the Court may:

(a)  Resolve the issue against the party;  and
(b)  Grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue

At the conclusion of plaintiff's proof the defendants moved this Court for a motion for a judgment as a matter of law.  The Court at that time reserved these motions on behalf of all defendants and requested that the defendants move forward with presenting their evidence.  At

1

the conclusion of the defendants' evidence, the defendants again moved this Court for a judgment as a matter of law and the Court at that time again reserved ruling and requested that the parties submit their motions with supporting briefs at the conclusion of the trial. The defendants herein now come before this Court and request the Court to enter judgment as a matter of law, judgment notwithstanding the verdict, or in the alternative a new trial and/or remittitur on the following issues:

### 1. **Breach of Settlement Agreement**

The plaintiffs attempted to present an issue before this Court claiming breach of an alleged settlement agreement by the defendants, Greg Crawford, Todd Robinson, and Eric Miller. The plaintiffs alleged that on Friday, January 6, 2006, Greg Crawford, Eric Miller, and Todd Robinson were in a building on Greenup Avenue (which is now rented by TriState Industrial Supply) and that the police arrived at the building pursuant to a request by Fastenal to go into the building to see if certain goods were located in the building. The evidence presented was that Greg Crawford and Ross Surratt had a telephone conversation, while the police were in the building.

Plaintiffs alleged that during this telephone conversation a settlement agreement was reached between Ross Surratt and Greg Crawford which bound Greg Crawford, Todd Robinson, and Eric Miller. Plaintiffs claim Ross Surratt and Greg Crawford agreed that these defendants would return the products purchased from Fastenal by New River Energy and not compete against Fastenal. The only evidence on this issue presented by the plaintiffs was the testimony of Ross Surratt. Ross Surratt testified that he demanded from Greg Crawford the return of the products and that defendants not compete against Fastenal. This testimony of Ross Surratt differed on key aspects from his previous deposition testimony and those differences were used

to impeach his testimony.

Ross Surratt testified at trial, " I demanded both that he return the products and that they not compete against Fastenal". His trial testimony went further to state Greg Crawford stated "OK" to these terms. However, in cross-examination, Ross Surratt clearly agreed that he had previously testified that Greg Crawford had never said "OK" to the terms, only that he (Ross Surratt) had demanded these things. Mr. Surratt further clarified his testimony and agreed that the parties only discussed that the defendants would return to Fastenal on Monday morning, January 8, 2006 to "review some documents". (Ross Surratt TR, p.116, line 4 – p. 120, line 14)

Greg Crawford was placed on the stand by plaintiffs and Greg Crawford clearly stated that he told Ross Surratt that he would see that the products were returned to him and would review documents on Monday morning. Greg Crawford further testified that Ross Surratt demanded that the parties come to the Fastenal office on Monday morning, January 8, 2006, to "review some documents" regarding a non-compete contract. Greg Crawford stated that he agreed only to go to the office on Monday morning, January 8, 2006, to "review some documents". (Greg Crawford TR. p.10, line 25 – p.11, line 15) Plaintiff submitted copies of unsigned non-compete contracts into evidence over defendants objection, to support testimony that plaintiff prepared non-compete contracts for defendants to review on Monday morning. The testimony was uncontroverted that those documents were never presented to any of the defendants, and these documents contained different and additional terms that were never mentioned or discussed on the previous Friday. Testimony was clear that the defendants never saw these documents until they were produced in discovery of this trial. (Greg Crawford TR p.11, line 16 – p.12, line 7)

It was testified by all three defendants that there were no conversations between Ross

Surratt and Eric Miller and no conversations between Ross Surratt and Todd Robinson. (Eric Miller TR p.4, line 8 – 10; Ross Surratt TR p. 39, line 8 – 10) The evidence was very clear that on the evening of Friday, January 6, 2006, no one on behalf of Fastenal, Inc. had any conversations or alleged agreements directly with Todd Robinson and Eric Miller. (Eric Miller TR p.4; Todd Robinson TR p.18) Further, the testimony clearly established that Todd Robinson had left the building early that evening prior to the ending of the conversation between Ross Surratt and Greg Crawford. (Todd Robinson TR p.18; Greg Crawford TR p.110, line 16 – 20; Rob Chase TR p.140, line 1 – 7; Ross Surratt TR p.39, line 1-4) The testimony of Rob Chase and Ross Surratt on behalf of Fastenal, established that there was no conversation with Todd Robinson until Saturday, January 7, 2006. Rob Chase testified on behalf of Fastenal that he contacted Todd Robinson on January 7, 2006 . He stated that he contacted Todd Robinson to "see if they were going to do what was discussed the night before with Greg Crawford". (Rob Chase TR p.140 – 141)

There was no testimony or evidence presented on behalf of the plaintiffs that any definite terms were reached between the parties regarding any agreement as to return of specific products nor as to agreements regarding a non-compete. The controlling law is clear that in order to reach an enforceable agreement/contract, whether oral or in writing, the contract terms must be definite and there must be a meeting of the minds of the parties as to the contract terms. Tennessee Enamel Manufacturing Company v. Stove, 192 F2d 863 (6th Cir. 1951).

The testimony from Ross Surratt was merely that he demanded "the parties not compete against Fastenal". (Ross Surratt TR p.38, line 8 – 11; p.37, line 24 – p.38, line 4) There was never any discussion or terms presented regarding a specific non-compete contract , specific term of years or months of a non-compete contract, or specific territory of a non-compete contract.

In order for a contract not to compete to be enforceable legally, it must be reasonable as to duration and territory. There not having been any discussions or any testimony with regard to any discussions as to a specific non-compete, who was not to compete, what the terms of the non-compete were, the duration of the non-compete, the territory of the non-compete, there could be no meeting of the minds regarding a contract. Accordingly, there can be no settlement agreement that could be breached with regard to this specific term

"It is well established that, to be enforceable, a contract must not be lacking in mutuality. The agreement must be definite to its terms, definite as to time, area, and consideration. There is therefore no meeting of the minds with regard to a binding contract, either expressed or implied, if the agreement is not definite as to its terms." Tennessee Enamel Manufacturing Company v. Stove, 192 F2d 863 (6th Cir. 1951). (Rob Chase TR p.175, line 5 – 11, acknowledgement of Plaintiff's counsel that written documents differed from conversation)

Further the Court must consider that there was no testimony or evidence presented that Todd Robinson or Eric Miller had given anyone permission to bind them in any agreement. The uncontroverted testimony was clear from Eric Miller that he knew Greg Crawford was speaking on the phone to Ross Surratt but he did not know what the conversation entailed. (Eric Miller TR (9/19/08), p.7, line 14 – 16) Eric Miller specifically stated that he had not at any time agreed to a non-compete contract with the company while he was employed there and had not given anyone permission to bind him to such a contract after he had left employment. Eric Miller clearly testified that he was on the other side of the room, that he could not hear the conversation, and that he had no conversations with Greg Crawford that evening regarding the demands of Ross Surratt on the telephone. (Eric Miller TR (9/19/08) p.17, line 17 – 19) Judgment as a matter of law on this issue must be found in favor of Eric Miller.

As to Todd Robinson, the testimony was also clear that Todd Robinson was in the building at the time the police arrived, however, Mr. Robinson had a sick child at home and informed the police officer that if he was not going to be arrested he needed to leave. (Todd Robinson TR p.17, line 9 – 24) Todd Robinson left the building while the police officers were still in the building and Greg Crawford was still on the telephone with Ross Surratt. Todd Robinson further stated that he did not know the basis of the conversation with Greg Crawford and that he had given no one permission to bind him in any agreements with Fastenal, or any other persons. Todd Robinson was not in the building at the time that Greg Crawford had finished the telephone conversation. The testimony from Todd Robinson as well as the district manager of Fastenal, Rob Chase, was that Rob Chase had contacted Todd Robinson the next day in order "to determine if the parties were going to show up on Monday morning" and if the parties were going to do what had been asked. (Todd Robinson TR p. 17 – 18, line 9, p.17 – 18, line 19)

The pleadings of the Plaintiff clearly set forth that they were seeking damages for breach of a settlement agreement that was alleged to have been entered into on January 6, 2006. Todd Robinson did not learn about the conversations between Ross Surratt and Greg Crawford until January 7, 2006. Therefore, it is clear that the claims against Todd Robinson must be found in favor of Todd Robinson and a judgment as a matter of law entered for Todd Robinson.

It is further clear that judgment must be entered in favor of Greg Crawford on the issue of breach of settlement agreement. There cannot be agreement between parties when terms of a proposed agreement are not set out and the parties do not agree. Plaintiff seeks to enforce an agreement based upon an unspecific demand of one party. There was no evidence from which an agreement could have been found and therefore no breach of a settlement agreement could be

found.

### 2. **Breach of Fiduciary Duty**

**Eric Miller -** The evidence that was presented by the Plaintiff with regard to breach of fiduciary duties was clearly in favor of judgment as a matter of law being entered on behalf of Greg Crawford, Todd Robinson, and Eric Miller. The testimony and evidence presented established that these three parties during their employment with Fastenal were good employees. They ran the Ashland branch profitably, and there were no concerns as to their job duties or the handling of their job duties while they were employed. There was absolutely no evidence with regard to Eric Miller and his performance of his job duties while employed with Fastenal. The evidence with regard to Eric Miller and the alleged invoice and order that is the subject matter of this action, stated that Eric's only involvement with the order was his normal, day-to-day activities. It set out clearly that Eric Miller looked at a computer to determine if the order had been delivered, once he saw that the order had been received by their Ashland branch and the order had been picked up by the customer, he went into the computer to release the order to be invoiced. This was in the normal, day-to-day operations of his job. Eric Miller had no connection with the order, or with any parties involved in the order at any time during his employment. (Eric Miller TR (9/17/08), p. 18, line 12 – 13)

It is further clear that Eric Miller did nothing more than leave his employment on Friday, January 6, 2006. Eric contacted Rob Chase asked him to come into his office and told him that he was leaving and he was going to the same employer as Greg Crawford and Todd Robinson. It was Rob Chase who asked Eric Miller to leave immediately and not serve out any notice with his employer. This testimony does not lead to any other conclusion than a favorable ruling for Eric Miller. (Eric Miller TR (9/17/08) p.11, line 16 – p.12, line 7) Eric Miller is entitled to judgment

as a matter of law on this issue.

**Todd Robinson** -   The testimony is equally in favor of Todd Robinson.  The testimony and evidence clearly stated that Todd Robinson performed his job as assistant manager of Fastenal in a good manner and helped run the store in a profitable manner.  The testimony is also clear that Todd worked his way up and held the position of assistant manager.

January 5, 2006, the day that Greg Crawford gave his resignation, Todd Robinson was out making sales calls in the area of the mines.  (Todd Robinson TR p.11, line 4 – 7)   Todd Robinson had no indication that Greg Crawford had given his resignation on January 5, 2006. The only uncontroverted testimony and evidence presented with regard to Todd Robinson's knowledge of the alleged invoice and order, that is the subject matter of this case, is that he was told that they had  received an order from a company, it was a large order, they were going to have to take it at a low margin and pull the ticket.  Todd Robinson testified this was not an unusual practice, did not cause him any concern and he went on about his business.  (Todd Robinson TR p.11, line 22 – 25;  p.12, line 3 – 10)

The testimony further set out that Todd Robinson gave clear thought to remaining with his employment at Fastenal.   On Friday morning, January 6, 2006, Todd contacted Rob Chase and questioned Rob Chase as to whether or not he would be offered the position of manager of the Ashland Fastenal branch.  It was at the point in time, when Rob Chase told him that they were bringing in a new manager from another store and that he could not promise him the manager position at the Ashland store, that Todd made the decision to leave his employment with the Ashland branch. (Rob Chase TR p.57, line 1)  There is no evidence or testimony that Todd Robinson took any documents with him or even reentered the Ashland Fastenal branch on Friday, January 6, 2006.  The evidence is clear that judgment as a matter of

law on this issue should be entered in favor of Todd Robinson.

**Greg Crawford -** The testimony from the Plaintiff and the evidence presented from the Plaintiff on behalf of their claim of breach of fiduciary duty against Greg Crawford supports judgment as a matter of law for Greg Crawford on this issue. Ross Surratt and Rob Chase, each specifically stated that Greg Crawford was an exemplary employee. (Ross Surratt TR p.18, line 3 – 7) He was given high trust in the company. He was afforded the ability to run the Ashland branch "as if it were his own store". The testimony clearly stated that Greg Crawford ran a profitable branch, that Greg Crawford put all of his efforts into his employment with Fastenal and that the Ashland branch ran well and made considerable profits under the management of Greg Crawford. (Greg Crawford TR p.20, line 20 – 21)

The testimony was also clear that Greg Crawford had been given the discretion to price items and orders as needed. Greg Crawford routinely priced orders without the direction and consultation of the district manager and the regional vice president and had done so for years with no complaints from the district manager and regional vice president.

In December of 2005, Greg Crawford was approached by Troy Bruner seeking a price quote. Greg Crawford had previously done business with Troy Bruner and his father Fred Bruner over the past ten years. He was familiar with them. He was familiar with their connections with Lawson Products and the fact the Lawson Products was a competing business. Troy explained to Greg Crawford that he and his father had intended to increase the business of S&K Supply, a small competing business owned by Sharon Bruner. They wanted to get price quotes for stock inventory for S&K Supply, and that they wanted to arrange a business deal with Greg Crawford through Fastenal and S&K Supply, wherein Fastenal would work with them and be their local supplier on some of their stocking inventory. Greg was also told at that time by

Troy Bruner that they would be seeking other quotes for this product. He asked Greg Crawford to give him a very competitive quote.

Greg Crawford took the list of inventory provided to him by Troy Bruner. The testimony clearly stated he worked on this inventory for over a week and that he prepared a price quote for Troy Bruner. All of this was done in an effort to sell business for Fastenal. On December 30, 2005, Troy Bruner contacted Greg Crawford, told Greg Crawford to place the order, that they would accept his quote for this stock inventory and Greg Crawford entered the order into Fastenal's computer. (Greg Crawford TR p.34, line 5 – 8)

The order was entered under the name of New River Energy at the request of Troy Bruner had explained to Greg Crawford that New River Energy would be purchasing the items. Greg Crawford entered the information as he had been told by Troy Bruner. He listed the business name that would be purchasing the product and the local business address, for New River Energy in Paintsville, Kentucky as the shipping address. On January 3, 2006, Troy Bruner contacted the Ashland Fastenal branch and advised them that when the order was received to contact him and he would pick the order up. On January 4, 2006, the Fastenal branch contacted Troy Bruner, told him what time the truck would be arriving with the order. Troy arranged to have the items picked up and taken from Fastenal's Ashland branch to a the building on Greenup Avenue where they were ultimately stored. (Greg Crawford TR p.58, line 4 – 6) There was absolutely no evidence that this order, the receipt of the order, the payment of the order, or anything else was taken in order to injure the business of Fastenal, Inc..

The evidence established that Fastenal actually made a gross profit from this order of 9%. The Ashland Fastenal branch would also be able to pull the ticket from its overall commission sales and it would not affect any of the employees at the Ashland branch with regard to their

commissions.   The Ashland branch would actually show store growth based upon the size of the order.   The employees of the Ashland branch that were paid on the growth of the business of the store would receive commission based upon growth. (Ross Surratt TR p.101, line 20 – 21; p.104, line 6 – 8)

There was no testimony that this specific order in any way injured Fastenal as a whole or the Ashland Fastenal branch.  There was no testimony or evidence presented that Greg Crawford acted in any way with intent to breach any fiduciary duties he had with Fastenal or to in any way injure Fastenal.

The claim of breach of fiduciary duty extends only to the period of time that the employees were actually employed with Fastenal.  Greg Crawford gave his resignation on January 5, 2006.  On January 5, 2006, there had been no issues or claims that Greg Crawford had done anything wrong with regard to his duty of loyalty and his duties as an employee of Fastenal. In fact, it was testified at that time that Rob Chase had tried to discuss with Greg Crawford staying for an additional two weeks to work out his notice and even rescinding his resignation.(Rob Chase TR p. 51, line 13 – 14)

The testimony was clear that during the time of his employment of Fastenal, Greg Crawford along with Todd Robinson and Eric Miller gave their complete and undivided loyalty and attention to Fastenal, worked toward the best interests of Fastenal and its employees. The Ashland branch, which was run by Greg and Todd, ran well, ran profitably, and there are no specific instances  evidenced at trial when any of these three gentlemen are alleged to have breached their duties of fiduciary loyalty towards Fastenal.  (Rob Chase TR p.51, line 5 - 17; p.32, line 7; p.33, line 17)  Accordingly, judgment should be entered on behalf of each of these defendants on this specific claim.

**3.** **Civil Conspiracy -** The plaintiff's proof submitted to the jury revolved around the

sale of a large quantity of fasteners, approximately 639 line items or 35,000 pounds, which was

subsequently used to help stock TriState Industrial Supply's inventory. This transfer of said

inventory is the underlying overt act alleged by the plaintiff to support the conspiracy/fraud

argument against the defendants. There were no other causes of action, events or facts presented

to the jury to establish a civil conspiracy.

Judgment as a matter of law should be granted on the plaintiff's civil conspiracy claim, as

the civil conspiracy is not an independent tort for which separate damages can be awarded.

The case of Williams v. Hall, et al., 683 F. Supp. 639, united States District Court, E.D.

Kentucky, Ashland Division, Judge Bertelsman wrote:

> "The common law of civil conspiracy looks to overt acts as the source
> of compensable injury. See Halberstam v. Welch, 705 F.2d 472, 477
> (D.C.Cir. 1983) at page 642. (Other citations omitted).

Judge Bertelsman's opinion in William v. Hall relies heavily upon the case of

Halberstam v. Welch, 705 F2d 472,477 (D.C. Cir. 1983). The Court in Halberstam viewed the

District of Columbia precedent stated that a civil conspiracy was not a separate independent tort,

stating:

> "District law acknowledges the concept of civil conspiracy, and
> assigns it the elements we outlined in Section II. A., supra-basically,
> an agreement to take part in unlawful action or a lawful action in an
> unlawful manner, and an overt tortuous act in furtherance of the
> agreement that causes injury. Early on, the tort of civil conspiracy
> was described as follows: "the essence of civil conspiracy is an
> agreement- together with an overt act- to do an unlawful act in an
> unlawful manner." Cooper v. O'Conner, 99 F2d 135, 142 (D.C. Cir.),
> cert. denied, 305 U.S. 643, 59 S Ct. 146, 83 L. Ed. 414 (1938).
> Edwards v. James Stewart & Co., 160 F.2d 935, 936-37 (D.C. 1976).
> Subsequent case emphasize that agreement can only lead to liability
> if an act pursuant to its causes injury. DeBobula v. Goss, 193
> F.2d 35, 36 (D.C. Cir. 1951); Blankenship v. Boyle, 329 F. Supp.
> 1089, 1099 (D.D.C.1971) ("gist of a civil conspiracy…is not the

agreement….,but civil wrong…done pursuant to the agreement"),
motion for stay denied, 447 F.2d 1280 (1971) (per curiam),
supplemented, 337 F.Supp. 296 (1972). The requirement of an
actionable injury may be explain why "there is no recognized
independent tort action for civil conspiracy in the District of Columbia."
Waldon v. Covington, 415 A.2d 1070, 1074n. 14(D.C.1980) (emphasis
added) (citing Lamont v. Haig, 590 F.2d 1124,1136 n. 73 (D.C. Cir.
1978)).Since liability civil conspiracy depends on performance of
some underlying tortuous act, the conspiracy is not independently
actionable; rather, it is a means for establishing vicarious liability
for the underlying tort (at page 479)."

To put it another way, as stated in Hooks v. Hooks, 771 F.2d 935, 944 (6th Cir.)…

"that an overt act was committed in furtherance of a conspiracy that caused injury
to the complainant (at Page 944).

The only evidence presented by the plaintiff with regard to the civil conspiracy allegation is merely as recited hereinabove, that Troy Bruner sought a quote from Greg Crawford for items that were going to be purchased through New River Energy and Stuart Ashton. There was no evidence that any of the defendants conspired or that an unlawful act was caused by any conspiratorial objective of any or all of the defendants to injure Fastenal. There was no evidence that any of the five defendants, or any two or more of the five defendants, conspired to injure Fastenal. The evidence was clear that none of the five defendants had a general shared objective. The evidence was clear that Todd Robinson and Eric Miller knew of the order merely through their jobs, and knew very little about the alleged order. That Greg Crawford merely did his job in providing Troy Bruner with a quote for items that Troy Bruner intended to purchase from Fastenal with the help of New River Energy.

Further, there is no evidence that any of the named defendants had any ownership in TriState Industrial Supply in December, 2005 through January 6, 2006. The evidence with regard to TriState Industrial Supply was merely that it was wholly owned by Sharon Bruner. In

13

the beginning of December, 2005, the name was changed from S&K Supply to TriState Industrial Supply. There was no evidence that Troy Bruner held an ownership interest in TriState Industrial Supply at the time the order was placed. (Plaintiff's Ex. No.11, Corp. documents, Articles of Amendment 12/29/05)

Plaintiffs evidence consisted merely of the fact that Stuart Ashton had an agreement with Chris Bruner . Chris Bruner gave information to Troy Bruner to allow Troy to order products and have those products paid for by New River Energy. Chris Bruner had no ownership interest in TriState Industrial Supply in December 2005 through January 2006.

In order to form a civil conspiracy there must be an agreement to injure another by an unlawful action.

The agreement between Stuart Ashton and Chris Bruner was not made with any intent to injure Fastenal or any other persons. There is no evidence that the agreement between Troy Bruner and Greg Crawford to purchase products from Fastenal was made with the intent to injure Fastenal. There was no evidence of an agreement between Todd Robinson, Eric Miller, TriState Industrial Supply, Greg Crawford, and Stuart Ashton there can be no connection found between these parties based upon the evidence and testimony presented by plaintiffs.

The plaintiff herein did not present any proof of an unlawful act that had been committed by any of the parties hereto, or any agreement by the parties to commit an unlawful act. It is not unlawful for parties to seek a quote from a business that in their normal course of business regularly give quotes for the purchase of products. The evidence clearly stated that Fastenal was in the business of selling fasteners and other industrial products. Fastenal regularly sold these products to competitors. Fastenal sold these products in the past to Troy Bruner and Fred Bruner while they were employed with Lawson Products, which is a competing

14

business.

The evidence presented by the plaintiff was merely speculation and conjecture on the part of the witnesses of the plaintiff with regard to their belief that the purchase was for any other reason than what was relayed to Fastenal at the time that Troy Bruner placed the order. The evidence provided by the plaintiff was merely that product was purchased, that product was purchased by New River Energy, with the express agreement of Stuart Ashton that he would agree to pay for the product. Evidence was presented that once the product was purchased, it was stored at the building of TriState Industrial Supply. That Stuart Ashton did pay for the product and that Stuart Ashton was repaid for the product by TriState Industrial Supply and the product then remained the property of TriState Industrial Supply.

There was no evidence of any conspiratorial agreement between the five named defendants. There was no evidence or testimony presented that Eric Miller and Todd Robinson knew anything about the purchase of the product other than an order had been placed and the product had been picked up. There was no testimony that Stuart Ashton knew anything more about the purchase of the product than that he was doing Chris Bruner a favor and going to pay for the product and he was going to be repaid. There was no testimony or evidence that Greg Crawford knew anything more about the product than it was being purchased for TriState Industrial Supply, through New River Energy. It is mere conjecture and speculation on the part of plaintiff that any civil conspiracy existed among these five defendants. There is absolutely no evidence of any common plan or objective of the five defendants to injure Fastenal.

As to TriState Industrial Supply, the record is clear that it was a wholly owned corporation in December 2005 through January 2006, and at that period of time was owned by Sharon Bruner (Plaintiff's Ex. No.11, Corp. documents, Articles of Amendment 12/29/05). S&K

Supply was the predecessor to TriState Industrial Supply having been wholly owned by Sharon Bruner since its inception in 1996. There was no testimony or evidence presented that any of the other named defendants had an ownership interest or employment interest with TriState Industrial Supply in December 2005 up until the week of January 8, 2006, when Greg, Todd, and Eric became employed by TriState Industrial Supply. The plaintiff presented evidence only who the owners of TriState Industrial Supply are now. (Plaintiff's Ex.11, dated 8/3/06) However, there was no evidence that any of these persons had any ownership interest in TriState Industrial Supply in December 2005 and the first week of January 2006 when Plaintiff alleges that a civil conspiracy took place. In fact the evidence was clear that these persons did not at that time have any ownership interest in TriState Industrial Supply. The record is deplete of any evidence of a civil conspiracy among the five defendants and all five defendants are entitled to judgment as a matter of law.

Further, the jury found no actual damages for the underlying fraud charge. Without damages to the underlying fraud charge, there cannot be a civil conspiracy to commit fraud. Defendants are entitled to judgment notwithstanding the verdict.


### 4. Fraud

The 6th Circuit, in Sanford Construction Company v. F&H Contracters, Inc., 443S.W.2d 227 (KY 1969), set out the six general elements that must be proven to establish fraud. An action of fraud cannot be maintained unless the following are found :

1. The defendant made a material representation;

2. That the representation was false;

3. That when the defendant made the representation he knew it was false or made it

16

recklessly without any knowledge of its truth;

4. That he made it with the intention of inducing the plaintiff to act upon the material representation;

5. The plaintiff acted in reliance upon the material representation; and

6. That the plaintiff thereby suffered injury because he acted upon the material misrepresentation.

It has been set out very clearly by the 6th Circuit and other Courts who have issued opinions upon the allegation of fraud and the requisites necessary to establish an allegation of fraud, "That if the alleged representation that was made by defendant was not  material or was not false, whether defendants did not know it was false and did not make it recklessly and with disregard for the truth, or did not make the representation intending that plaintiff should be induced to act upon it, or if plaintiff was not induced to act upon the representation, or if he did so without any injury or loss resulting to him, no cause of action exists in favor of the plaintiff." Id.at p.227  .

It is clear in the case at hand, that plaintiff has alleged that the material representation was the quote that was generated for Troy Bruner and the fact that Greg Crawford took the quote at a low margin.  Plaintiff has alleged fraud against Greg Crawford, Todd Robinson, Eric Miller, TriState Industrial Supply, Stuart Ashton, and New River Energy.  There is no evidence that Todd Robinson, Eric Miller, Stuart Ashton, and New River Energy made any representations toward Fastenal.  The only allegation is that Troy Bruner came in to Fastenal and sought a quote for materials.  Greg Crawford gave the quote, gave the quote at a very low margin, with the intentions of seeking additional business through TriState Industrial Supply.  Greg Crawford told his district manager, Rob Chase, that he took the quote and took the order at a very low margin.

(Rob Chase TR  p.46, line 2-7)  There is no indication of evidence or testimony that Greg Crawford, or any other person mislead Fastenal, Rob Chase, or any other representative of Fastenal with regard to margins of the quote.  In fact the testimony was clear that once Rob Chase was told the quote was taken at a low margin and the ticket would need to be pulled in order not to effect the stores commissions,  Rob Chase went on to discuss other things and did not at any time seek to investigate further with regard to the order.

In the previously cited case of Sanford Construction Company v. F&H Contractors, Inc., the Court clearly stated that, "once a plaintiff has had the opportunity to engage in an investigation on his own and had the ability to rely upon his own investigation, and either chose not to continue the investigation or relied upon his own investigation to his own detriment, he cannot then be said to have a cause of action against the plaintiffs for fraud."  ID at p.234.  It is clear from the testimony herein that the plaintiff was given sufficient information, he was aware that a large order had been taken at the Ashland Fastenal branch.  He was aware enough of the order to contact the Ashland Fastenal branch and seek information about it, he had the opportunity on January 5, 2006, when he spent the entire day at the Ashland Fastenal branch to delve into any questions he had about the order, to check into the invoice, to seek further information from Greg Crawford the store manager or any other persons in the store with regard to this order.  It was the district managers own decision at that time not to seek any further investigation with regard to this order.  (Rob Chase TR p.46, line 11)  There was nothing from any of the defendants that prevented the Fastenal district manager from investigating further with regard to this order and it was the reliance upon his own investigation or lack thereof, that created the issue and the order from not being found and the exact determination of the margins the order was taken at from not being determined prior to January 6, 2006.  In fact, the only

reason plaintiffs have come about and sought this action with regard to fraud, came about not as a result of the order being entered, but as a result of the fact that the branch manager and assistant branch manager as well as a third employee left the employment of Fastenal. Nothing about the leaving of their employment gives rise to an action of fraud.

With regard to the defendant, TriState Industrial Supply, Troy Bruner gave information to Fastenal with regard to the order. TriState Industrial Supply gave Fastenal all of the necessary and relevant information. The order was being used ultimately by TriState Industrial Supply. The order was being paid for by another company, New River Energy. They further gave Fastenal information that the order destination would be changed. They gave them that information the day before the order arrived at the Ashland branch. There was nothing about the order having been placed by TriState Industrial Supply that was fraudulent in nature.

Plaintiffs claim that due to the fact that their district manager and their regional vice president were not aware of the ultimate use of the product or that is was going to be resold that fraud had occurred. There was no duty upon Stuart Ashton, New River Energy, or TriState Industrial Supply to advise Fastenal as to the ultimate use of the product. There was no evidence that Fastenal routinely obtains information regarding the ultimate use of products that they sell. The testimony was clear that they sell to competitors on a routine basis and that they sell to persons who ultimately resell their product on a routine basis.

There is further no evidence that Todd Robinson, Eric Miller, or Greg Crawford engaged in any fraudulent activities with regard to Fastenal. There is no evidence that Todd Robinson and Eric Miller engaged in any acts other than to give their resignation and leave their employment with Fastenal. The only act that they have been accused of committing is giving their resignation and leaving their employment with Fastenal during the same week. This is not

fraudulent in nature nor does it lead to any action by the plaintiff against either of these gentlemen. Todd Robinson and Eric Miller did ultimately take employment with TriState Industrial Supply, which is now a competing business. However, Todd Robinson and Eric Miller did not have non-compete contracts preventing them from entering that employment.

Greg Crawford further did not engage in any act of fraud against Fastenal. Greg Crawford took the information that he was provided for the order and placed it on the appropriate invoice and order form as he had done for many years in his employment with Fastenal. Greg Crawford entered the information as was given to him by the purchaser. Greg Crawford entered the correct information with regard to the person and business that was purchasing the items. Greg Crawford did not make any material misrepresentations with regard to the product. Greg Crawford did not hide the invoice, he did not hide the order, or engage in any other activities which could be considered fraudulent with regard to this order. Therefore, based upon the above case law and the above facts set out in plaintiff's case, the action for fraud against the above named defendants should be dismissed and judgment as a matter of law on the issue of fraud entered in favor of each of these defendants set out herein.

### 5. Punitive Damages

The 6th Circuit in Chicago Title Insurance Corp. v. Magnuson, 487 F.3d 985 (6th Cir. 2007) set out the standard for review in determining the constitutionality of a punitive damage award. The Court therein held to the standard set forth in State Farm Mutual Auto Insurance Co. v. Campbell, 538 US 408,123 S.Ct. 15 13,155 L.Ed. 2d585 2003, wherein the Supreme Court stated that;

"Grossly excessive or arbitrary punishments should be set aside as they do not put citizens on sufficient notice of possible legal repercussions that they

may face as a result of their actions and thus, do not satisfy the guarantee of due process of law set out in the 4th Amendment.' <u>ID at p.416-17</u>.

The Court in <u>Chicago Title Insurance Company</u> stated that the guide pose a Court must use in determining the excessiveness of a punitive damages award are;

1.  The degree of reprehensibility of the defendants misconduct;

2.  The disparity between the actual or potential harm suffered by the plaintiff and the punitive damages awarded;

3.  The difference awarded by the jury and the civil penalty authorized or imposed in comparable cases.

In determining the actions or the necessity of the punitive damage award jury instruction, the Court needs to first look at the reprehensibility of the alleged defendants conduct.  In determining the reprehensible nature of the alleged defendants conduct, the Court in <u>Chicago Title</u> referred to <u>BMW of North America v.Gore</u>, 517 US 559, 116 S.Ct. 1589, 134 L.Ed. 2d809 (1996), wherein several factors were determined that the Court needs to look at in its decision regarding the reprehensibility of the defendants conduct.  The Court in <u>Gore</u> at p. 575 stated:

" A number of factors must go into the inquiry of reprehensibility;
    a)  The harm caused was physical as opposed to economic;
    b)  Tortuous conduct events in indifference to the reckless disregard to the health and safety of others;
    c)  The target of the conduct had financial vulnerability;
    d)  The conduct involved repeated actions or was an isolated incident;
    e)  And the harm or the result of the intentional malice, trickery, or deceit were not mere accident.
The existence of any one of these factors weighing in favor of the plaintiff may not be sufficient to sustain a punitive damages award and the absence of all of them renders any award suspect.  It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendants culpability after having paid the compensatory damages is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deter it." <u>Chicago Title at p. 999</u>.

The Court in Chicago Title went through the litany of factors set out in <u>Gore</u> to

determine reprehensibility of the defendants conduct.  As in <u>Chicago Title</u>, the case at bar must go through the same inquiry.  In the case at bar, the harm that plaintiff has alleged was economic as opposed to physical harm.  The conduct that the plaintiff complains of was not evinced with reckless disregard of the health or safety of others, it was specifically economic.  The target herein, Fastenal, Inc., was not financially vulnerable.

In <u>Chicago Title</u>, the Court dealt with a breach of an actual covenant not to compete.  The breach was a result of a contract that was entered into between the defendants and Chicago Title.  Defendant had agreed not to compete when he sold his insurance company.  Defendant had initially agreed to a ten year non-compete contract, a total of ten years based upon a five year employment and a five year non-compete contract.  Although other issues involved in the case dealt directly with the non-compete contract, the Court had found that within the first year after his employment,  defendant had breached his non-compete contract and therefore, damages and punitive damages had been imposed upon defendant.  The Court therein engaged in a review of several issues, one of which included the punitive damages award.  In engaging in the review of the punitive damages award, the Court made the determination that Chicago Title was not entitled to a  punitive damage award in this specific action.

In making their determination, the Court determined that <u>Chicago Title</u> was not a financially vulnerable plaintiff.   In determining the financial vulnerability of <u>Chicago Title</u> , the Court stated that Chicago Title was the anti-thesis of a plaintiff that could be considered to exhibit financial vulnerability, due to the company's large size as well as its self-professed status as still having the number one position in Ohio a year after defendant's departure.

In our case in chief, Fastenal herein evidenced that it grossed $ 2.2 billion dollars in profits and that in the year following the opening of TriState Industrial Supply that it grossed $140 million in this region.  (<u>Ross Surratt TR p.92, line 3 - 16</u>) Testimony from Ross Surratt was that in 2008 the profits in this region alone would be more than $140 million.  (<u>Ross Surratt TR p.109, line 24 - p.110, line 5</u>)  Thereby leaving the Court with the ability to determine from the testimony of Fastenal alone that the profits of Fastenal were increasing, that they maintained their large share of the market place, and that they had not been injured by the storefront opening of TriState Industrial Supply, or the inventory order that was sold to TriState Industrial Supply.

By the testimony of the company representative of Fastenal, it is stated that the company was not suffering as a whole within the market place and that their profits were continuing to

increase, thereby giving the Court no criteria from which to determine that Fastenal could be considered a financially vulnerable victim.  As was clear, the harm that was alleged to Fastenal was not physical in nature, but economic in nature.  Therefore, the first two factors that the Court needed to determine have not been met by Fastenal.

 Fastenal cannot be said to have sustained physical harm.  Fastenal cannot say that the tortuous conduct alleged to have occurred, was occurred with indifference or a  reckless disregard of the health or safety of others.  Fastenal cannot meet the third criteria .

 The fourth criteria the Court needs to look at is the conduct and whether or not it involved repeated action or was an isolated incident.  The conduct complained of by Fastenal was a one time order that was taken by an employee of Fastenal in December of 2005.  It was not repeated actions of  harm, in fact there was no evidence of any repeated actions.  Fastenal's allegations contained one incident which occurred in December 2005, and the first week of January 2006.  Therefore, Fastenal cannot make the fourth criteria regarding punitive damages.

 The Court in Chicago Title Insurance Corp. found that although defendant was determined to have engaged in intentional malice or trickery, the conduct of the defendant was not sufficiently reprehensible to award a punitive damage award.  The Court stated that by meeting a higher number of the reprehensibility factors set out above, the plaintiff has a better chance of supporting a jury's award of punitive damages but, the Supreme Court did not set a threshold number of the five factor that must be met.  In fact, the Court stated that the existence of one factor might not be enough, but left open  the possibility that  award could be appealed even if none of the factors were present.  The Court in Chicago Title found that the only factor present in that specific case was that the defendant acted with malice.  However, because there were no physical injuries or threat to personal safety, and because Chicago Title was not a financially vulnerable victim the fact that the defendant acted maliciously was insufficient to support a finding that the defendants behavior was sufficiently reprehensible for an award of punitive damages.  The Court specifically set out again and referred to the case of State Farm:

> "It should be presumed that he plaintiff has been made whole for his injuries by compensatory damages.  The punitive damages should only be awarded if the defendants' culpability after having paid compensatory damages is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrent." Chicago Title at p.1001,  and they found therein an award of punitive damages was inappropriate.

As in the case of <u>Chicago Title</u>, Fastenal cannot meet four of the five factors for reprehensibility. Fastenal further cannot meet the fifth factor of intentional malice, trickery, or deceit and defendants are entitled to judgment as a matter of law on the issue of punitive damages.

### 6. Punitive Damages for fraud cannot be awarded to the Plaintiff as a matter of law, as Plaintiff suffered no actual damage

Under Kentucky law, one cannot be compensated for fraud without actual injury.

Common law fraud required actual damages or to put it another way "it is a long, well established rule that fraud without damages gives no rise to a cause of action." <u>Long v. Howard</u>, 75 S.W. 2d 742, 743 (Ky. App. (1934)) citing <u>Hicks v. Wallace</u>, 266 S.W. 247; <u>Curd v. Bethel</u>, 58 S.W. 2d 261.

More recent cases set forth actual elements for common law fraud or deceit:

> "We have adopted as general rule that an action cannot be maintained for fraud or deceit unless it be made to appear (1) that the defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with intention of inducing the plaintiff to act, or that it should be acted upon by the plaintiff; (5) that the plaintiff acted in reliance upon it and; (6) that the plaintiff thereby suffered injury." <u>Sanford Construction Company v. S&H Contractors, Inc.</u>, 443 S.W. 2d Ky. App. (1969)

These six elements were recently reaffirmed by Kentucky Supreme Court in 1999 in the case of <u>United parcel Service Company v. Rickert</u>, 996 S.W. 2d 464, 468 (1999), maintaining that all six elements must be established by clear and convincing evidence. <u>See</u> also <u>Hardway Management Company v. Southerland</u>, 977 S.W. 2d 910 (1997) stating…"the fraud is actual only if it results in damage to complainant" citing to <u>Graham v. John R. Walts & Son</u>, 36 S.W. 2d 859 (1931) at page 917.

Since plaintiff failed to prove actual damages for fraud the award for punitive damages must also fail.

**7.   The Jury awarded Punitive Damages for fraud under Instruction 34 must be set aside**

As stated above, actual damages must be proven in order to establish a prima face case of fraud.  Further, punitive damages for fraud must fail as the plaintiff failed to establish an underlying element of fraud, i.e. damages above.  In addition, to assess punitive damages for fraud when no actual damages of fraud were awarded would be a constitutional violation of the defendants due process right.  The United States Supreme Court ruled in BMW v. Gore, 517 U.S. 559, that the Court must look at the actual harm caused or potential harm.  It goes without saying that if the defendant did not cause actual harm, punitive damages cannot be assessed.

In addition, an award of $10,000.00 in punitive damages when there was a zero award of compensatory damages is a grossly excessive ratio.  BMW v. Gore, 517 U.S. 559, also, Clark v. Chrysler Corporation, 436 F.3d 594.


**8.   Trade Secrets**

A Court may grant judgment as a matter of law on a particular issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue…" FRCP Rule 50 (a) (1).  Plaintiff has failed to provide any evidence that would permit a reasonable jury to find that any of these defendants misappropriated trade secrets.  Plaintiff failed to identify any trade secrets.  The first element a plaintiff alleging misappropriation of trade secrets must prove is that the information at issue actually constitutes a "trade secret".  Mike's Train House, Inc. v. Lionel, LLC, 472 F.3d 398 (6th Cir. 2006) citing Stomback v. New line Cinema, 384 F3d 283, 302 (6th Cir. 2004).

Plaintiff herein did not identify any information that it was alleging were trade secrets. Plaintiff offered evidence only that the "average costs" could be determined on one order from an invoice if an algebraic formula was used to calculate the profit margin.  However, it was further testified by plaintiff's witnesses that these average costs changed almost daily and the "mark up" or profit margin used to determine invoices also changed based upon different items,

different orders and different customers.  (<u>Rob Chase TR p.121, line 1; p.124, line 12;  p.118, line 117;  p. 119, line 6; p.120, line 12 – 20; p.123, line 11 – 25</u>)

There was no evidence of any documents or information having been taken or removed from plaintiff.  There was no evidence that any of the named defendants used any trade secret information, (<u>Rob Chase TR p.125, line 6; p.126, line 7</u>), had any information , nor that any such information was divulged or misappropriated.

The <u>6th Circuit</u> has held that in order to constitute a trade secret, the information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of  efforts that are reasonable under the circumstances to maintain its secrecy. <u>Mike's Train House, Inc. at p.410.</u>  In the instant case, there was no evidence of trade secrets even being in the possession of the named defendants.

Even in the broad stretch that this Court could determine the "average cost" information which may have been derived off of one invoice after doing an algebraic formula could constitute a trade secret, plaintiff did not present any evidence that the named defendants did the algebraic formula and determined the "average cost", or that the "average cost" would be of economic value if known.  They further presented no evidence to that such information was used, divulged, or misappropriated in any way.

As such, each of the named defendants are entitled to judgment as a matter of law on this issue of misappropriation of trade secrets.

## 9.   Breach of Confidentiality Agreement

Plaintiff alleged breach of a confidentiality agreement only against the defendant, Greg Crawford.  .  Plaintiff's only possible argument that Greg Crawford  breached this agreement again referred to the information set out on a regular invoice of plaintiff.

Plaintiff offered no specific evidence of any breach of this agreement.  Plaintiff admitted that no documents or items were removed from plaintiff's premises by Greg Crawford. (<u>Rob Chase TRp.125, line 6 – 14</u>)  Plaintiff did not provide any evidence that Greg Crawford at any time divulged any "confidential information'" to any other persons or entities. (<u>Ross Surratt TR p.122, line 6 – 21</u>)

The agreement, on its face, sets out duties of the employee upon leaving Fastenal, Inc.  It states "upon the discontinuation of employment with the company, regardless of the reason, you will immediately deliver all confidential information to the company".  A literal reference that

this agreement refers to tangible items that are to be returned to the company. As plaintiff's evidence was clear that Greg Crawford did not take any items from Fastenal, he could not be found in Breach of the Confidentiality Agreement.

Further, there was no evidence offered that specifically identified what, if any, confidential information was divulged by Greg Crawford.

Greg Crawford is entitled to judgment as a matter of law on this issue.

**10.** **Conversion**

Meade v. Richardson Fuel, Inc., 166 SW 2d 55 (KY App 2005) specifically sits out the elements necessary to establish the tort of conversion in Kentucky. It states " the Kentucky Supreme Court recently notes the elements necessary to establish the tort of conversion:

1) The plaintiff had legal title to the converted property;

2) The plaintiff had possession of the property or the right to possess it at the time of conversion;

3) The defendants' exercised domination over the property in a manner which denied the plaintiffs' rights to use and enjoy the property and which was to the defendants own use and beneficial enjoyment;

4) The defendants' intended to interfere with the plaintiffs' possession;

5) The plaintiff made some demand for the property's return which defendants refused,

6) The defendants act was the legal cause of the plaintiff's loss of the property; and

7) The plaintiff suffered damage by the loss of the property.

Id at p.58

Plaintiff, herein , cannot maintain an action for conversion due to the fact that plaintiff cannot meet these essential elements. Specifically, plaintiff did not present any evidence that it made demands for the return of property, which any of the defendants refused. In fact, the evidence presented was to the contrary.

The evidence was clear that the only demand made by plaintiff for the return of the property was a demand by Ross Surratt on January 6, 2006, to Greg Crawford. At that time,

Greg Crawford agreed to help get the property returned.

A demand for the return of the property was never made on any other defendant, and there is no evidence of any refusal on the part of any defendant to return the property. In fact, the evidence clearly established that on more than one occasion, the defendants offered to return the property and plaintiff refused to accept it. The testimony was uncontroverted that Stuart Ashton made at least three personal offers to return the property and even offered to pay the shipping costs and other costs associated with the return and restocking of these items. These offers were refused by plaintiff each time.

Plaintiffs witness Ross Surratt testified that a letter was received by plaintiff in January 2006, offering the return of these items on behalf of the defendants. This offer was refused by plaintiff. (Ross Surratt TR p.41, line 3 – 46) Plaintiff's failure to accept the return of the goods, and evidence that defendants actually made offers to return the items and no evidence of a refusal to return the goods by defendants is fatal to plaintiff's cause of action for conversion.

Defendants herein are further entitled to judgment as a matter of law on the issue of conversion because plaintiff failed to prove other essential elements of the claim. Plaintiff did not offer any evidence as to each specific defendant as to any intention to interfere with plaintiffs possession, as to any specific acts of each defendant causing plaintiff's loss of property nor damages suffered as a result of each individual's acts.

Plaintiffs own actions were the cause of any damages suffered by failing to accept the return of the items. These defendants are entitled to judgment as a matter of law on the issue of conversion.


### 11. Conclusion

For the reasons set forth hereinabove, defendants, Greg Crawford, Todd Robinson, Eric Miller, and TriState Industrial Supply, Inc. should have Judgment entered in their favor on each issue.


Respectfully submitted,


 /s/Sharon E. Rowsey

SHARON E. ROWSEY
Attorney for Defendant's Greg Crawford, Todd Robinson,
 Eric Miller, and Tri-State Industrial Supply, Inc.


## CERTIFICATE OF SERVICE

I hereby certify that on  November 26, 2008, I electronically filed the foregoing with the Clerk of Courts by using CM/ECF system, which will send notice of electronic filing to the following:



Hon. Leigh Latherow
VanAntwerp, Monge, Jones, Edwards
& McCann
1544 Winchester Ave., fifth floor
Ashland, KY 41101
llatherow@vmje.com

Hon, Michael Endicott
225 Court Street
Paintsville, KY 41240
endicotm@bellsouth.net


  /s/Sharon E. Rowsey