**ELECTRONICALLY FILED**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**
**CIVIL ACTION NO. 06-cv-00061-HRW**

FASTENAL COMPANY,                                                    PLAINTIFF,

vs.            **PLAINTIFF'S RESPONSE TO DEFENDANTS,**
         **GREG CRAWFORD, TODD ROBINSON, ERIC MILLER,**
         **AND TRI-STATE INDUSTRIAL SUPPLY'S MOTION FOR**
         **JUDGMENT AS A MATTER OF LAW, FOR JUDGMENT**
         **NOTWITHSTANDING THE VERDICT, FOR A NEW TRIAL,**
         **AND/OR REMITTITUR**

GREG CRAWFORD, ET AL.

                                                    DEFENDANTS.


       Comes now the Plaintiff, Fastenal Company ("Fastenal"), by and through counsel, and for

its Response to the Defendants, Greg Crawford, Todd Robinson, Eric Miller, and Tri-State

Industrial Supply's (collectively referred to as "Tri-State Defendants") Motion for Judgment as a

Matter of Law, for Judgment Notwithstanding the Verdict, for a New Trial, and/or Remittitur

[Docket Nos. 163 and 164], states as follows:

                            **INTRODUCTION**

       On September 19, 2008, a jury of this Court returned a verdict against each defendant in

this case.   The verdict came at the end of a four day trial and only after the jury heard testimony

from each of the defendants, and only after the jury had an opportunity to evaluate each

defendant's credibility and veracity.   The defendants were given a full opportunity to present their

defenses.   At the conclusion, the jury awarded Fastenal a total of $300,000.00 in compensatory

damages and an additional $200,000.00 in punitive damages.   While the damages award is no

doubt substantial, given the magnitude of the January 4, 2006 Invoice and the absolute lack of contrition displayed by the defendants during trial, the award certainly does not lie beyond the bounds of due process.

In fact, based upon the jury instructions and damages awarded, it appears that the jury understood the evidence and awarded damages in a manner to avoid recovery more than once for claims based upon the same fact pattern. A spreadsheet of the jury's findings is attached hereto as **Attachment 1**. Further, the Tri State Defendants' motion is rife with factual arguments which only underscore the fact that the issues set forth therein were matters for the jury, and not the Court, to decide. Therefore, the Tri-State Defendants' motion should be denied.

## ARGUMENT

### I. Defendants are not entitled to a directed verdict nor judgment notwithstanding the verdict.

#### A. Applicable standards.

In <u>Smith v. Louis Berkman Company</u>, 894 F.Supp. 1084 (W.D.Ky. 1995), the United States District Court for the Western District of Kentucky explained the standard for granting a directed verdict in favor of the defendant as follows:

> The Court may grant a judgment as a matter of law in favor of Defendants if during the trial Plaintiff was fully heard on an issue and there was no legally sufficient basis for a reasonable jury to find for Plaintiff on that issue. The Court does not weigh evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury. Instead, the Court must view the evidence in the light most favorable to the non-moving party, Plaintiff in this case, and give him the benefit of all reasonable inferences. The motion should be granted if reasonable minds could not come to a conclusion other than one in favor of the Defendants.

<u>Id.</u> at 1093.

The standard for judgment notwithstanding the verdict is equally high. It "is appropriate

only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the non-moving party." Pouillon v. City of Owosso, 206 F.3d 711, 719 (6th Cir. 2000); See also Boris v. Choicepoint Services, Inc., 249 F.Supp.2d 851 (W.D.Ky. 2003).

The Tri-State Defendants, like the New River Energy Defendants, have never even alleged that the jury verdict did not comport with these standards. This is presumably because the verdict came after the jury heard testimony and evidence from both sides and only after the jury had an opportunity to evaluate this testimony and evidence. The verdict was clearly within the standards set forth above, and as such, should not be disturbed.

**B.     Breach of the settlement agreement.**

The Tri-State Defendants first claim that Plaintiff presented insufficient evidence to support its claim for breach of the settlement agreement between Plaintiff and the individual Tri-State Defendants, Greg Crawford, Todd, Robinson, and Eric Miller. Pursuant to this settlement agreement, Plaintiff agreed to not to press criminal charges against these individuals in exchange for their agreement to return the goods on Monday morning and not to compete against Plaintiff. [Transcript of Jury Trial Testimony of Ross Surratt, p. 38]. The parties were to memorialize this agreement in writing on Monday morning when the goods were returned. Id. While Plaintiff upheld its end of the bargain, as testified to by Ross Surratt and Rob Chase, the individual Defendants failed to memorialize the agreement or to return the goods. [Transcript of Jury Trial Testimony of Ross Surratt, p. 62; Robert Chase, pp. 100-102]. As shown by the transcripts, this was amply supported by the evidence at trial, and as such, the Defendants' motion is without merit.

Generally, "an agreement must contain definite and certain terms setting forth promises of

performance to be rendered by each party." Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc., 242 S.W.3d 359, 364 (Ky.App. 2007). The Sixth Circuit, in Arnold Palmer Golf Company v. Fuqua Industries, Inc., 541 F.2d 584 (6th Cir. 1976), further recognized that:

> The courts are quite agreed upon general principles. The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention. If their expressions convince the court that they intended to be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract. 1 Corbin on Contracts, § 30 (1963).

Id. at 587-88.

The Court, relying on a New Jersey case, further noted that:

> Parties may orally or by informal memoranda, or by both, agree upon all essential terms of the contract and effectively bind themselves, if that is their intention, even though they contemplate the execution, at a later time, of a formal document to memorialize their undertaking.

Id. at footnote 3, p. 589.

In the Arnold Palmer case, the Sixth Circuit found that it was a question of fact as to whether or not the parties intended there to be a binding obligation until the agreement was signed, which could only be determined after consideration of the relevant evidence. In this case, the terms of the parties' agreement were sufficiently agreed upon on Friday night. Plaintiff Fastenal agreed not to press charges in exchange for the Defendants' agreement to bring the product back on Monday and not to compete against Fastenal. The formal documents ready and waiting on Monday morning were nothing more than a memorial of that agreement. Whether or not the Defendants intended to be bound by the agreement made on Friday night was a question of fact

that properly went to the jury and should not be decided on a directed verdict motion.

The Tri-State Defendants' characterization of the evidence should not change this result. While the Defendants attempted to impeach Ross Surratt's testimony by using portions of a deposition transcript concerning his conversation with Greg Crawford ("Crawford") on Friday night, they were unsuccessful in doing so. Ross Surratt specifically stated that Crawford was aware of, and agreed to the terms of the agreement. Ross Surratt testified that, when he presented the terms of the agreement to Crawford, Crawford attempted to qualify the terms by stating that he would bring the goods back. [Ross Surratt, pp. 134-138]. However, Ross Surratt testified that he unequivocally told Crawford that he would have to agree to return the goods and not to compete with Fastenal, to which Crawford then agreed. [Ross Surratt, p. 38; Transcript of Jury Trial Testimony of Greg Crawford (during Plaintiff's case in chief), p. 113].

The Tri-State Defendants further attempt to support their claims by stating that the actual non-compete documents admitted into evidence were never presented to the Defendants and that they contained different terms than those previously agreed upon. These agreements were properly admitted by the Court, which noted that Defendants' counsel had "opened the door" to their admission. [Transcript of Jury Trial Testimony of Robert Chase, pp. 142-143, 173-176]. Moreover, the documents were not admitted for the purpose of establishing the terms of the agreement. Those were already agreed upon on Friday night. Instead, they were offered to show that Plaintiff's representatives acted on their belief that an agreement had been reached, by taking the next step to draft the formal documents over the weekend. [Robert Chase, p. 173]. The fact that the documents contained a less restrictive non-compete agreement is of no bearing and actually would have worked to the Defendants' advantage, had they come to memorialize their

agreement on Monday morning.

Both sides' actions over the next few days evidenced their belief that an agreement had been reached on Friday night. Not only did Plaintiff draft the formal documents to memorialize the agreement, but Rob Chase, the district manager, testified that he contacted Defendant Todd Robinson over the weekend to ensure that he would honor his end of the bargain. [Robert Ch ase, pp. 91-93]. At trial, Todd Robinson ("Robinson") confirmed that this conversation took place. [Transcript of Jury Trial Testimony of Todd Robinson, p. 18]. Rob Chase testified Todd Robinson told him that the Defendants would be there on Monday morning, and that they just wanted everything to "go away." [Robert Chase, pp. 91-93]. Clearly, this demonstrated that Robinson believed that he had entered into a binding agreement and, at least at that time, intended to honor it. Obviously, Robinson had no reason to come in Monday morning or to make everything "go away" had no agreement been reached. Further, Defendants' counsel, acting on their behalf, also indicated that an agreement had been reached between the parties. In her letter to Plaintiff on January 9, 2006, she accused Plaintiff of coercing her clients in to indefinite non-compete agreements. [Plaintiff's Exhibit 5]. As acknowledged by Eric Miller at trial, the Defendants could not have been coerced into an agreement which never existed. [Transcript of Jury Trial Testimony of Eric Miller (during Plaintiff's case in chief), p. 47].

In short, the jury was asked to decide who they believed as to whether an agreement was reached. This decision undoubtedly required weighing the evidence and the credibility of the witnesses. The jury found the Plaintiff's evidence more credible than that of the Defendants. Clearly, this issue was properly sent to the jury and would be improperly disposed of on a directed verdict.

## C.     __Breach of fiduciary duty.__

The former Fastenal employees do not contest that they owed Fastenal a duty or that they were fiduciaries during their employment. Rather, the former employees argue that they are entitled to judgment in their favor because they purportedly did not take any action against the interests of Fastenal while still employed there. However, the evidence demonstrated otherwise.

"A fiduciary relationship creates the highest order of duty imposed by law. If a fiduciary relationship exists, the fiduciary cannot profit from the relationship without the knowledge and permission of the principal." In re Salle, 286 F.3d 878, 891 (6th Cir. 2002). The individual defendants profited from their inside positions at Fastenal. Their positions allowed them to place the order, price the product, release the product without the signature of the person who picked up the order, and release the order without obtaining the required credit application. [Greg Crawford, pp. 21-22, 61, 68]. They profited from this scheme by jump starting their business with product obtained at a fraction of the whole price - to Fastenal's detriment. Moreover, they continue to profit from their relationship by using the proprietary information they obtained during their employment relationship as a basis for determining which business to solicit for their new business. In fact, the Defendants used the Fastenal invoice and the price they gave themselves to obtain better prices for the same goods from other vendors--prices that they could not have otherwise gotten. [Transcript of Jury Trial Testimony of Troy Bruner (during Defendants' case in chief), pp. 35-38].

The evidence demonstrated that all three individual defendants—Crawford, Miller, and Robinson, participated in the scheme to procure these goods from Fastenal. As Rob Chase testified, Eric Miller ("Miller") told him, "We're all in this together." [Robert Chase, pp. 58-59;

Eric Miller (during Plaintiff's case in chief), pp. 12-13]. Crawford had been a trusted employee, who was given the ability to price orders within certain limits. He was not given carte blanche authority, as the Defendants suggested. [Robert Chase, p. 13]. However, Crawford abused this trust by pricing this order far below these limits, covering up his actions, and then quitting before he was discovered.

Miller released the ticket for this invoice and allowed the goods to be picked up without a signature or a credit application on file. [Eric Miller (during Plaintiff's case in chief), p. 18]. The Defendants claim that he should not be liable because Rob Chase asked him to leave his employment at Fastenal. However, that was to be expected after Miller admitted that he, Greg Crawford, and Todd Robinson were all engaged in a concerted effort to establish a competing business, and the other employees had already quit. [Robert Chase, pp. 58-59]. Further, the order was placed for all of their benefit and use at Tri-State.

Contrary to the Defendants' claims, the evidence clearly showed that both the Ashland Fastenal store and its employees lost a great deal of money on this order. [Robert Chase, pp. 109-110]. Rob Chase testified that Fastenal would not have ever made this sale had it been aware of all the information. [Robert Chase, p. 43]. Even if the sale had been made, Ross Surratt testified that it would have been at no less than the published wholesale price. [Ross Surratt, pp. 12-14]. The difference between the actual amount of this sale and the published wholesale price was $138,802.87.

The Tri-State Defendants' claim that they gave their "complete and undivided loyalty and attention to Fastenal, worked toward the best interests of Fastenal and its employees" is simply ludicrous. [Tri-State Defendants' Memorandum in Support of Motion, Docket No. 164-2, p. 11].

8

As Shane Collingsworth, a fellow Fastenal employee, testified at trial, the Defendants had been planning to leave Fastenal and start their own business for several months. [Transcript of Jury Trial Testimony of Shane Collingsworth, pp. 5-9]. When they finally did start that business, the Defendants did so on Fastenal's dime and time. This was wrongful and the jury properly found that these employees breached their fiduciary duties and duty of loyalty.

### D.   Civil conspiracy.

#### 1.   This Court has recognized civil conspiracy as a separate cause of action, and thus the verdict must stand.

The Tri-State Defendants claim that they are entitled to a directed verdict, because civil conspiracy is not a separate cause of action for which recovery can be had. However, this Court has recently acknowledged that Kentucky courts do recognize a separate cause of action for civil conspiracy. See National Information and Communications Equipment Network, Inc. v. Willigan, 2007 WL 2979928 (E.D.Ky. 2007); Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V., 2007 U.S. Dist. LEXIS 31313, Civil Action No. 06-388-KSF (E.D.Ky. 2007)(copy attached). As such, the Tri-State Defendants' claim is without merit and should be overruled.

Assuming *arguendo*, though, that this Court does find that civil conspiracy is not a separate cause of action, the damages award under this instruction should still not be disturbed. A conspiracy exists "where two or more persons enter into a plan or partnership to accomplish an illegal act." Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc., 410 F.Supp.2d 592, 598-99 (E.D. Ky. 2006). See also James v. Wilson, 95 S.W.3d 875, 896-97 (Ky. 2003) (defining "civil conspiracy" to mean "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by an unlawful means"). The combination of the Defendants' activities was clearly wrongful and

unlawful. Tri-State, via Troy Bruner, wrongfully placed the order through a sham corporation. [Greg Crawford (during Plaintiff's case in chief), p. 21]. This corporation, New River Energy, via Stewart Ashton, Jr., allowed Tri-State to use its name and its checkbook to procure the goods. [Transcript of Jury Trial Testimony of Stewart Ashton, Jr. (during Plaintiff's case in chief), pp. 5, 21]. Ashton further attempted to cover up the Defendants' actions by telling Ross Surratt that the goods were to be used in his coal wash business. [Stewart Ashton, Jr. (during Plaintiff's case in chief), pp. 19-20; Ross Surratt, pp. 35-36]. Greg Crawford wrongfully priced the order well below the established guidelines, lied about the sale to his district manager, and then quit before he could be caught. [Greg Crawford (during Plaintiff's case in chief), pp. 27, 29, 57, 59]. All of the former employees quit and immediately went to work for a competitor. [Todd Robinson, pp. 7-8; Eric Miller (during Plaintiff's case in chief), pp. 11-12]. They have wrongfully used these goods and the information they learned at Fastenal to target Fastenal's customers and undercut Fastenal's pricing. [Eric Miller (during Plaintiff's case in chief), pp. 29-32]. This combination of events, conducted in a covert manner, constitutes a conspiracy. The Defendants' unlawful activities were clearly fraudulent as well. The jury found as much by determining that each of the Tri-State Defendants—Greg Crawford, Todd Robinson, Eric Miller, and Tri-State Industrial Supply—had committed fraud.

The individual Tri-State Defendants further attempt to disclaim liability by noting that they were not owners at the time of this sale. Tri-State further also attempts to disclaim liability by noting that neither Chris Bruner, who brought Stewart Ashton, Jr., into the scheme, nor Troy Bruner, who placed the order with Fastenal, were owners at the time of the sale. However, this is clearly irrelevant. Obviously, ownership is not necessary for one to act on behalf of another

person or entity, nor for the other person or entity to be liable for that person's actions. All of these individuals were acting for Tri-State's and their own best interests, and their lack of ownership does not relieve them or their company of liability.

Simply because the jury chose to award damages under this instruction, rather than the fraud instruction, which notably came at the very end of the instructions, does not mean that Fastenal did not prove that the Tri-State Defendants acted fraudulently or that they acted in concert in performing these fraudulent activities. The damages award for civil conspiracy is proper, and the Tri-State Defendants' motion should be denied.

      2.    **The Tri-State Defendants waived any objection they might have had to a separate damages award under the civil conspiracy instructions.**

Like the New River Energy Defendants, the Tri-State Defendants had the opportunity to object to a separate damages award for civil conspiracy, but failed to do so. The jury instructions were discussed at length with Magistrate Judge Atkins at the jury charge conference on August 15, 2008. A partial copy of the transcript from the August 15, 2008 jury charge conference has already been filed in the record. [Docket No. 166-3]. A copy of the full transcript has also been requested and filed. There was no objection to the civil conspiracy instruction to the extent that the instruction provided for the jury to award separate damages on the civil conspiracy claim.

Given the length of the original instructions, Judge Atkins asked that the parties submit streamlined instructions within seven days. Counsel for the Tri-State Defendants was given ample opportunity to object to this instruction either during the jury charge conference or during the drafting of the original and/or streamlined instructions, but chose not to do so. The Tri-State Defendants cannot now complain that the instructions were incorrect or unfair to them in any way.

      E.    **Fraud.**

11

The Kentucky Supreme Court has set forth six elements that must be established in an action for fraud--(1) a material representation by the defendant, (2) which is false, (3) known to be false or made recklessly by the defendant, (4) made with inducement to be acted upon, (5) the plaintiff acted in reliance thereon and (6) causing injury to the plaintiff. <u>United Parcel Service Company v. Rickert,</u> 996 S.W.2d 464, 468 (Ky. 1999). See also <u>In re Sallee</u>, 286 F.3d 878, 895-96 (6th Cir. 2002) (applying Kentucky law to fraud claim). Fraud may be committed either by intentionally asserting false information or by failing to disclose the truth. <u>Rickert</u> at 469. "The motive is the same in either case, and the result should be the same, since it is the intention that constitutes the fraud." <u>Dennis v. Thomson</u>, 43 S.W.2d 18, 23 (Ky. 1931). Partial truths may also constitute fraud. <u>Rickert</u>, 996 S.W.2d at 469. "[O]nce a party chooses to make a representation, the party cannot keep secret information needed to make the representation accurate." <u>In re Sallee</u>, 286 F.2d at 896. Further, a plaintiff may establish detrimental reliance "when he acts or fails to act due to fraudulent misrepresentations." <u>Rickert</u>, 996 S.W. 2d at 469.

Rob Chase testified that Crawford told him that this order was for a new customer, a coal business in Paintsville, Kentucky. [Robert Chase, p. 46]. Crawford knew that this was false, and that the order was actually for Troy Bruner, a direct competitor. [Greg Crawford (during Plaintiff's case in chief), pp. 23, 27, 33, 57, 59]. The story of a new coal wash business was simply relayed to disguise to whom the order was really going. While the former employees as well as the Bruners, as owners of Tri-State, have alleged that their reasoning for placing the order in the name of New River was to secure the additional time for payment, the undisputed bank and checking records, however, tell the true story. In fact, Tri-State paid New River, and its check cleared the bank, several days before New River ever wrote its check to Fastenal. [Plaintiff's

Exhibits 12 and 13; Transcript of Jury Trial Testimony of Fred Bruner, pp. 7-10]. New River was not acting as a bank; it was a decoy to funnel the goods to Tri-State.

Because he was allegedly trying to secure repeat business from the new customer, Crawford told Chase that he had to price the order "very low." [Greg Crawford (during Plaintiff's case in chief), p. 54; Robert Chase, p. 46]. The invoice itself indicated that the products were ultimately going to an end user, rather than for resale. [Robert Chase, p. 77; Plaintiff's Exhibit 4]. However, Crawford knew that this was not true. [Greg Crawford (during Plaintiff's case in chief), pp. 23, 35]. Crawford admitted that Troy Bruner told him that the order was for his own new business and for re-sale, and not to a coal company as an end user. [Greg Crawford (during Plaintiff's case in chief), p. 21]. Crawford knew that the products were always intended for resale. In fact, Bruner told Crawford that the order would not be placed in the name of S&K Industrial Supply (Tri-State's predecessor), but would be funneled through New River. [Greg Crawford (during Plaintiff's case in chief), p. 33]. Crawford, under the guise of future business for Fastenal, priced the order well below the markup that he was permitted to offer customers. This order was priced at only 5% above Fastenal's point of sale cost. However, the lowest markup Crawford was allowed to authorize without approval from his supervisor was 1.4, or $1.40 for an item costing $1.00. [Ross Surratt, p. 5].

Deceiving Fastenal was simply the fastest, cheapest and easiest way for Tri-State and the former employees to secure their start-up inventory. Rob Chase, Fastenal's district manager, testified that Fastenal would never have approved this sale had it been apprised of all the facts, but certainly would never have made a sale of this magnitude at such a low margin. [Robert Chase, p. 43]. Further, Fastenal would not have extended a discount to a direct competitor. [Ross Surratt,

pp. 12-14].   However, the former employees hid the true nature of the transaction from Fastenal long enough for the product to make its way from Fastenal's distribution center to Tri-State's warehouse.   Fastenal did not learn the true nature of the sale until after the goods were delivered, the former employees had all quit, and it began investigating the circumstances surrounding these events.

The Tri-State Defendants claim that there was nothing about the individual Defendants leaving their employment that gives rise to a claim of fraud.   Nothing could be further from the truth.   The circumstances surrounding the Defendants' resignations overwhelmingly bear the indicia of fraud—they placed an order for themselves well below established guidelines, left themselves enough time for the order to come in and be picked up, and then quit before their actions could be uncovered.

The Tri-State Defendants further claim that Fastenal's alleged failure or delay in investigating their actions somehow relieves them of liability for fraud.   However, the testimony of Rob Chase demonstrates that the fraud was already committed well before it actually came to light.   Because the individual Defendants quit without working any notice period, Rob Chase was frantically trying to run the store and get help from other branches.   [Robert Chase, p. 62].   Further, at first glance, the invoice appears to be in order.   [Robert Chase, p. 78].   It was not until Eric Miller told him they "we're all in this together" that Rob Chase became suspicious of this large order.   [Robert Chase, pp. 58-59].   By then, however, the goods were gone, and so were the employees.   Nothing Rob Chase might have done at that point could have mitigated the Defendants' fraud, nor should it relieve them of liability now.

Additionally, the Tri-State Defendants claim that neither New River Energy nor Ashton, Jr.

made any fraudulent representations to Fastenal, so they cannot be implicated for this fraudulent transaction. At trial, though Ashton, Jr., admitted that he, both individually and on behalf of New River, told multiple, conflicting stories of his participation in the transaction. [Stewart Ashton, Jr. (during Plaintiff's case in chief), pp. 16-17].   He allowed Tri-State to use New River's company name and a false delivery address in Paintsville, Kentucky as a part of a scheme designed to make Fastenal believe that it had gained a new, out of town customer.   [Stewart Ashton, Jr. (during Plaintiff's case in chief), pp. 10-12, 27].   Neither he nor anyone else from New River placed the order, although it was represented as such.   [Stewart Ashton, Jr. (during Plaintiff's case in chief), p. 27].   Most importantly, Ashton, Jr. neglected to inform anyone that New River was purportedly "acting as a bank" for Tri-State either before the sale or during the subsequent investigation, including in the explanation that he provided to the Ashland Police Department in his Affidavit, which made its way into the APD investigation file. [Stewart Ashton, Jr. (during Plaintiff's case in chief, pp. 18, 21; Plaintiff's Exhibit 8].

When Ross Surratt contacted Ashton, Jr. on Friday, January 6, and confronted him about the suspicious Invoice and transaction, Ashton, Jr. never mentioned any "loan" or "bank" arrangement between New River and Tri-State.   Id.   At first, Ashton, Jr. told Surratt that he had a coal wash plant where the product was going to be used.   When Surratt advised Ashton, Jr. that he believed the goods were going to be used by a new competitor, Ashton, Jr. stated that he was not going to lie for anybody and that was what was happening. [Ross Surratt, pp. 35-36].   The Defendants' actions were fraudulent and the jury found as much.   The jury's verdict should stand.

**F.**       **Punitive damages award.**

        **1.**       **Actual damages awarded were sufficient to justify the punitive damages award.**

Actual damages do not need to be awarded on each individual count in order for the plaintiff to recover punitive damages. Rather, it is sufficient that actual damages were awarded on one or more of the counts alleged by the plaintiff if the claim arises out of the same fact pattern. In this case, the jury verdict clearly demonstrates that the jury found that the defendants, including the Tri-State Defendants, engaged in fraud. The fraud was the procuring of the product at a grossly discounted price, using New River Energy as the decoy. Greg Crawford intentionally misled Rob Chase, his district manager, by telling him that the order was for a new coal company in Paintsville, Kentucky. [Greg Crawford (during Plaintiff's case in chief), pp. 57, 59; Robert Chase, p. 46]. He knew that it was the start up inventory for Tri-State, of which he and the other individual defendants were becoming owners. [Greg Crawford (during Plaintiff's case in chief), p. 29]. They "were all in it together," as Rob Chase testified Eric Miller told him. [Robert Chase, pp. 58-59]. All of the Tri-State Defendants willingly participated and acquiesced in this scheme. The jury clearly awarded damages based upon that fact pattern, but awarded the damages only once in the prior instructions and not twice, which would have been a double recovery.

In Palm Beach Atlantic College, Inc. v. First United Fund, Ltd., 928 F.2d 1538 (11th Cir. 1991), punitive damages were awarded to a seller of a yacht, based upon conduct of the corporate purchaser and its representative in attempting to obtain the yacht at less than the agreed to price, though the jury did not award seller any compensatory damages for fraud. The jury awarded compensatory damages of $200,000.00 based on breach of contract, and the breach of contract claim arose from same acts as the fraud claim. The defendants argued, albeit unsuccessfully, that punitive damages for fraud cannot be awarded based on nominal damages alone. Id. at 1546. The Eleventh Circuit rejected this contention, explaining that:

This, however, is not a case which involves only nominal damages. Here the jury found compensatory damages of $200,000 based on breach of contract.

In addition, the breach of contract claim arose from the same acts as the fraud claim, and thus the jury's award of punitive damages was not solely based on nominal damages.

Id. at 1546-1547.

The Northern District of Alabama examined a similar question in McClain v. Metabolife Intern., Inc., 259 F.Supp.2d 1225 (N.D.Ala. 2003).   In that case, the court awarded $75,000.00 in punitive damages against a diet pill manufacturer for intentional fraud.   The Court held that it was not constitutionally excessive under the Due Process Clause, despite the fact that the jury awarded the consumer no compensatory damages for intentional fraud.

Like the cases set forth above, the jury in this case awarded compensatory damages of $124,000.00 on the conversion claim and $100,000.00 on the conspiracy claim.   The conversion and the conspiracy both arose out of the same fact pattern.   Therefore, it is not illogical to conclude that the compensatory damages awarded when taken as a whole support the Plaintiff's award of punitive damages on the fraud allegation, and that actual damages were, in fact, awarded in this case.

## 2.    Actual damages are not necessary to recover punitive damages.

An award of actual damages is not necessary to receive punitive damages where fraud is concerned.   It has long been the rule in Kentucky that "if a right of action exists that is, if the plaintiff has suffered an injury for which compensatory damages *might be awarded*, although nominal in amount he may in a proper case recover punitive damages."   Louisville & N.R.Co. v. Ritchel, 147 S.W. 411, 414 (1912). (emphasis added.)   The Ritchel Court further stated that:

It is true that there are respectable authorities which appear to hold that punitive

damages cannot be awarded when the actual injury is merely nominal. In our opinion, however, this view is not correct, and does not agree with a great weight of authority. The correct rule, we think, is that if a right of action exists; that is, if the plaintiff has suffered an injury for which compensatory damages might be awarded although nominal in amount, he may in a proper case recover punitive damages....[T]he fact that the jury returned a verdict for punitive damages only, furnishes no just reason why the verdict should not be allowed to stand, since, under the rule in force in this State, punitive damages, when allowed, are given as compensation to the plaintiff and not solely as punishment of the defendant.

Id.   See also Commonwealth Dept. of Agriculture v. Vinson, 30 S.W.3d 162 (Ky. 2000);

Nappe v. Anschelewitz, 97 N.J. 37, 477 A.2d 1224 (1984).

In 2006, the Supreme Court of Kentucky once again examined the issue of awarding punitive damages when no compensatory damages are awarded.   In an unreported opinion, the Supreme Court of Kentucky held that it was not error to award the landowners in a public nuisance action arising from neighbors' blocking of the road, punitive damages but no compensatory damages. Roberie v. VonBokern 2006 WL 2454647 (Ky. 2006).   Instead, the Court recognized that "the direct impact of the tortious conduct is sometimes difficult to quantify and may best be addressed by punitive damages."   Id. at *6.   Further, "[t]he only requirement for punitive damages in this regard is that the injury be the sort for which compensatory damages, even if only nominal, are available."   Id.

In addition to the principles set forth above, the Kentucky Supreme Court determined that an award of punitive damages absent compensatory damages is not a per se violation of due process.   Id. at *7.   The Supreme Court of Kentucky explained that when awarding punitive damages where no compensatory damages are awarded three guideposts or factors should be considered:

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive

damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Campbell, 538 U.S. at 418, 123 S.Ct. at 1520 (paraphrasing the guideposts from Gore, 517 U.S. at 575, 116 S.Ct. at 1598-99).

Id. at *8.

Other jurisdictions have determined that actual damages need not be awarded in order for punitive damages to stand. Instead, there need only be a basis for actual damages. In Griffith v. Barnes, 560 F.Supp.2d 29 (D.D.C., 2008.), the court stated:

> Furthermore, punitive damages can be awarded only if there is a "basis for actual damages." Maxwell v. Gallagher, 709 A.2d 100, 104 (D.C.1998). That is to say, there does not need to be an award of actual damages, so long as there is "at least a basis in the evidence for actual- i.e., compensatory-damages before punitive damages may be awarded." Jemison v. Nat'l Baptist Convention, U.S.A. Inc., 720 A.2d 275, 284 n. 7 (D.C.1998). For example, in Dyer v. William S. Bergman & Assocs., Inc., 657 A.2d 1132 (D.C.1995), the D.C. Court of Appeals affirmed an award of punitive damages even though the trial court set aside an award of compensatory damages. 657 A.2d at 1139. The court found that the trial court did not set aside the compensatory damages award on the basis that plaintiff suffered no injury; rather, the trial court wanted to prevent a double recovery due to a prior arbitration award. Id. Similarly, while Griffith has not sought an award of actual damages under the CPPA, there is a basis in the record for such an award.

Further, the criteria set forth in BMW v. Gore, 517 U.S. 559, 116 S.Ct. 1589 (1996), relied upon by the Tri-State Defendants, actually support the jury's award of punitive damages against them. In terms of financial vulnerability, Fastenal has never claimed that the entire company was damaged as a result of the Defendants' actions. However, the evidence showed that the Ashland store suffered greatly. Rob Chase testified that he, left in the wake of the Defendants' actions, personally lost money as a result of this sale and the subsequent loss of business to the Tri-State Defendants. [Robert Chase, pp. 109-110]. Because half of the store's full-time employees became the competition within twenty-four hours, the remaining employees were left scrambling to simply wait on customers and fulfill orders. [Robert Chase, p. 62; Greg Crawford (during

Plaintiff's case in chief), p. 10]. New and inexperienced employees had to be hired in the Defendants' places. Clearly, this affected the store's customer service and ultimately their sales. Contrary to the Defendants' claims, this case certainly involved repeated actions and not an isolated incident. While there was only one sale of goods, the Tri-State Defendants continued to reap the benefits of the goods and the information they obtained from Fastenal. This was reflected in their ability to start their business, to gain former Fastenal customers very quickly, and to obtain the product from other vendors at a very low cost. As Fred Bruner testified at trial, many of these customers (and the only customers for which Fastenal claims damages) were not customers with whom the Bruners had any prior relationship. [Fred Bruner, p. 11; Plaintiff's Exhibits 16 and 17].

It is clear from the facts of this case that the jury conclusively decided that there was evidence sufficient to support an allegation of fraud. The jury determined that defendants Crawford, Robinson, Miller, Tri-State Industrial Supply, Inc., Ashton, and New River Energy Resources are all liable for civil conspiracy. Simply because the jury decided that they did not want to award compensatory damages twice on two separate claims for the same damages does not mean that the Court should not sustain the jury's award of punitive damages. The jury has made their choice, and this Court should uphold it based on a reading of the law in the Commonwealth of Kentucky and elsewhere.

**G.   Trade Secrets.**

The Tri-State Defendants further claim that they are entitled to judgment upon Fastenal's claim for misappropriation of trade secrets, because Fastenal allegedly did not identify any trade secrets at trial. Contrary to the Tri-State Defendants' assertions, numerous trade secrets, such as

pricing information, profit margin, costs, and customer sales histories, were identified at trial. Fastenal further introduced evidence concerning the methods by which the Defendants were believed to have misappropriated this information, and the damages suffered by Fastenal as a result. Consequently, the Tri-State Defendants' claim must fail in this regard.

Kentucky has adopted the Kentucky Uniform Trade Secrets Act (hereinafter "KUTSA"), KRS 365.880 *et seq*., which establishes a statutory scheme governing the definition, protection, and penalties for the misappropriation of trade secrets. <u>Auto Channel, Inc. v. Speedvision Network, LLC</u>, 144 F.Supp.2d 784, 788 (W.D.Ky. 2001). Trade secret laws are designed "to protect standards of commercial morality." <u>PepsiCo, Inc. v. Redmond</u>, 54 F.3d 1262, 1268 (7th Cir. 1995). Although the KUTSA was passed nearly twenty years ago, "no Kentucky court has published a decision interpreting or applying the law." <u>Auto Channel</u>, 144 F.Supp.2d at 788. "Because KUTSA is a uniform law, however, decisions in other jurisdictions provide guidance for its application and construction." <u>Id.</u>; <u>See also</u> KRS 365.894 ("[KUTSA] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [KUTSA] among states enacting it.").

To establish a trade secret misappropriation claim, a plaintiff must show that: (1) the information in question qualifies as a trade secret, and (2) the trade secrets have been misappropriated. KRS 365.880; <u>Auto Channel</u>, 144 F.Supp.2d at 794. A trade secret is defined in the KUTSA as information, including a formula, pattern, compilation, program, data, device, method, technique, or process, that:

a.   Has independent economic value;

b.   Is not readily ascertainable by proper means; and

c. Was the subject of reasonable efforts to maintain its secrecy.

KRS 365.880(4).

To determine whether customer information is a trade secret, courts traditionally distinguish between that which is "discoverable only through extraordinary efforts and through many years expenditure of time and money" versus information that "may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses." ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc., 402 F.3d 700, 714 (6th Cir. 2005). Neither this Court nor the Sixth Circuit have addressed whether detailed customer information is a trade secret under the KUTSA. However, a myriad of other jurisdictions, interpreting similar acts, have found that certain specialized, confidential customer information may be protected as a trade secret. Prudential Insurance Company of American v. Baum, 629 F.Supp. 466, 472 (N.D.Ga. 1986). See also Zoecon Industries v. American Stockman Tag Co., 713 F.2d 1174 (5th Cir. 1983)(products purchased, quantities, and dates of purchases by customers); Kelly Services v. Eidnes, 530 F.Supp.2d 940 (E.D.Mich. 2008)(pricing lists, profit margins, contractual details, marketing and sales strategies); Haught v. Louis Berkman, LLC, 417 F.Supp.2d 777 (N.D.W.Va. 2006)(customer lists, potential customer lists, pricing information, profit margins, costs, financial information, and customer credit card information); Steve Silveus Insurance, Inc. v. Goshert, 873 N.E.2d 165 (Ind.App. 2007) (crop insurance customers' farm descriptions, past insurance coverage, and loss histories); Molex, Incorporated v. Nolen, 759 F.2d 474 (5th Cir. 1985)(pricing information); Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc., 147 F.Supp.2d 1057 (D.Kan. 2001)(customer lists, dates and amounts of money involved in fireworks shows performed for each customer); Surgidev Corporation v. Eye Technology, Inc.,

828 F.2d 452 (8th Cir. 1987)(identity of physicians implanting a "high volume" of plaintiff's intraocular lenses). Generally, the determination of whether the information constitutes a trade secret is a question of fact. Baum, 629 F.Supp. at 472; Guang Dong Light Headgear Factory Co., Ltd. v. ACI International, Inc., 521 F.Supp.2d 1153, 1172 (D.Kan. 2007).

The second step required under KUTSA is to establish the misappropriation of a trade secret. Misappropriation is defined as:

    a.    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

    b.    Disclosure or use of a trade secret of another without express or implied consent by a person who:

        1.  Used improper means to acquire knowledge of the trade secret; or

        2.  At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

            a.      Derived from or through a person who had utilized improper means to acquire it;

            b.      Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

            c.      Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

        3.  Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

KRS 365.880(2). The KUTSA clearly contemplates that the employee, as well as the new employer, may be held liable for misappropriation of the plaintiff's trade secrets. See also

<u>Fireworks Spectacular</u>, 147 F.Supp.2d at 1067. "[I]f [the former employer's] pricing information became widely known, competitors could price [them] out of business by underbidding to its customers . . . ." <u>Guang Dong</u>, 521 F.Supp.2d at 1173-74.

The Sixth Circuit, along with numerous other jurisdictions, have recognized that misappropriation can rarely be proved by direct evidence. In <u>Stratienko v. Cordis Corporation</u>, 429 F.3d 592 (6th Cir. 2005), the Court stated that:

> Presented with defendants' witnesses who directly deny everything, plaintiffs are often required to construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what the plaintiffs allege happened did in fact take place. Thus, requiring direct evidence would foreclose most trade-secret claims from reaching the jury because corporations rarely keep direct evidence of their use ready for another party to discover.

<u>Id</u>. at 601. Consequently, circumstantial evidence may be used to demonstrate that the defendants "knew of the confidential information, had the opportunity to acquire it for [their] own use, and did so." <u>Byrd's Lawn & Landscaping, Inc. v. Smith</u>, 542 S.E.2d 689, 693 (N.C.App. 2001). <u>See also</u> <u>Southwestern Energy Company v. Eickenhorst</u>, 955 F.Supp. 1078 (W.D.Ark. 1997); <u>Frantz v. Johnson</u>, 999 P.2d 351 (Nev. 2000); <u>RKI, Inc., d/b/a Roll-Kraft v. Grimes</u>, 200 F.Supp.2d 916 (N.D.Ill. 2002).

This case presents the exact scenario predicted by the Sixth Circuit in <u>Stratienko</u>. As expected, the former employees denied any wrongdoing in their defection from Fastenal. However, the evidence clearly indicates that the Defendants knew of Fastenal's confidential information, had the opportunity to acquire it for their own use, and did so. <u>Byrd</u>, 542 S.E.2d at 689. According to the testimony of Rob Chase, Fastenal maintains many confidential customer

details in its computer system, including what items the customer purchased, the amount of the customer's total purchase, and the price that the customer was charged for each item. [Robert Chase, pp. 18-19, 27-28]. Fastenal's pricing is unique to each customer. It depends on a number of factors, such as how quickly the customer pays for its orders, the customer's credit risk, the ease with which an order can be processed by Fastenal, and the shipping method. This information is obtained from the system in the form of usage reports, which are used internally at Fastenal to improve its customer service. As noted by Rob Chase, the former employees had access to the information contained in these usage reports. [Robert Chase, pp. 18-19, 27-28, 35-36, 39]. Rob Chase further testified that a significantly higher amount of usage reports were run in the days prior to the Defendants' departure. [Robert Chase, p. 22]. Further, the former employees were also privy to Fastenal's cost for each item it sold. [Todd Robinson, p. 5; Eric Miller (during Plaintiff's case in chief), p. 22]. This information would obviously be very useful to someone starting a new business, as it was not readily obtainable through telephone books, the internet, or by calling local businesses. [Robert Chase, p. 30]. Instead, this information was the result of years of extraordinary business efforts and established customer relationships with Fastenal. In fact, Ross Surratt explained at trial that it had taken Fastenal forty years of cultivating relationships to achieve its prices. [Ross Surratt, p. 26]. On the other hand, the Tri-State Defendants expected the jury to believe that they somehow achieved this pricing overnight, without any wrongdoing on its part. [Transcript of Jury Trial Testimony of Troy Bruner (during Defendants' case in chief), p. 43]. Obviously, the jury did not believe this. In actuality, the Defendants turned around and used the subject invoice to get better prices from other vendors on the same items. Id. at pp. 35-38. Just as Fastenal had feared, the Defendants

began using the invoice as leverage in their own new business.

Fastenal informs its employees of the proprietary nature of this information upon hiring, and generally requires them to sign confidentiality agreements as a condition of employment. Greg Crawford admitted signing a confidentiality agreement. This agreement precludes employees from disclosing any information on Fastenal's computer system, including prices, customer identities, and customer incentives. Notably, Chris DeMaria, a former Fastenal employee who testified during the Defendants' case-in-chief, was fired for allowing a non-employee to access Fastenal's computer system. [Transcript of Jury Trial Testimony of Christian DeMaria, pp. 4, 7]. Clearly, Fastenal established that it took steps to protect its trade secrets. [Robert Chase, pp. 25-26].

The Tri-State Defendants obviously used the information they obtained at Fastenal to target potential Tri-State customers. They were keenly aware of the customers who purchased on credit. They were also aware of the profit margins offered to various Fastenal customers, because they were often responsible for setting them. These men have the same general responsibilities at Tri-State as they did at Fastenal. [Todd Robinson, p. 20]. Further, the Defendants testified about the criteria they used to identify desirable Tri-State customers, including timely payments, repeat business, and volume. The former employees' knowledge of whether customers met these criteria clearly came from their intimate knowledge of Fastenal's business, and not from outside sources or public records. [Eric Miller (during Plaintiff's case in chief), pp. 9-11, 29-31].

In short, the former employees could not erase from their memories the intimate details of Fastenal's business to which they were privy during their extended employment with Fastenal.

This was substantiated by the testimony of their former district manager at Fastenal, Rob Chase. [Robert Chase, pp. 18-19, 27-29, 35-36, 39]. The evidence introduced at trial clearly demonstrates that the former employees did not forget the confidential Fastenal customer information, but instead put it to use for their new business at Tri-State. "In other words, [Fastenal] finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." PepsiCo, Inc., 54 F.3d at 1270. The former employees actively used Fastenal's "playbook" to draw its customers away from Fastenal to Tri-State. The jury's verdict was in accordance with the weight of the evidence and should not be disturbed.

### H.    Breach of Confidentiality Agreement.

Throughout each of the former employees' employment at Fastenal, the Company had in place a Confidentiality and System Use Policy ("Policy"). This Policy prohibited employees from disclosing either during or after termination of their employment Fastenal Confidential Information. Some of the specifically identified types of confidential information enumerated in the policy included: market strategies, business plans, trade secrets, potential business opportunities, procedures or processes, customer or vendor information or contacts, prospect information, financial data, cost and sales data.

Upon an employee beginning employment, Fastenal disclosed the Policy through a written Confidentiality and System Use Acknowledgment form. The form sets forth the Company's policy and specifically notifies employees that violation of the Policy will cause irreparable harm to the Company and warned that Fastenal "may seek injunctive relief or damages including attorney's fees and costs, from [the employee] for violating [the Policy] obligations." [Plaintiff's Exhibit 10]. The form presented to employees served as acknowledgment that the employees had

received and understood the condition of their employment.

Greg Crawford executed an Acknowledgment form during his employment at Fastenal. [Plaintiff's Exhibit 10]. He was aware of Fastenal's Confidentiality Policy and the consequences of violating it. However, he tried to qualify his awareness at trial by stating that he thought it only applied to documents and tangible items. A cursory review of the specifically identified items such as potential business opportunities clearly demonstrates that the Policy also encompassed intangible items. Crawford, like the other employees, had inside confidential information from Fastenal - whether customers paid on time, whether the customer was likely to give them repeat business, the customer's sales history (volume) – that he used in targeting new customers. [Robert Chase, pp. 18-19, 27-28]. Greg Crawford had knowledge that Troy Bruner and Fred Bruner lacked regarding running a store front industrial supplier business. He was aware of Fastenal pricing information and customer profit margins. Id. The confidential information obtained by these employees is not simply erased from their minds by submission of a resignation. This type of information falls within the scope of the Policy and is not allowed to be used by the former employees. Greg Crawford was properly found liable for breach of this Confidentiality Policy by the jury.

## I.     Conversion.

Conversion is the wrongful exercise or assumption of authority, whether personally or by procurement, over the property of another. Illinois Central R. Co. v. Fontaine, 289 S.W. 263, 267 (Ky. 1926). Neither motive, intent, nor good faith is material to an action for conversion. Urban v. Lansing's Administrator, 39 S.W.2d 219, 220-221 (Ky. 1931); State Automobile Mutual Insurance Company v. Chrysler Credit Corporation, 792 S.W.2d 626, 628 (Ky.App. 1990). The measure of damages in conversion is the value of the property at the time of the conversion. State

Automobile, 792 S.W.2d at 627.

Each and every Defendant in this case has engaged in conversion of Fastenal's goods. Greg Crawford knew that the goods were to be for resale in his own new business. [Greg Crawford (during Plaintiff's case in chief), pp. 22-23, 33, 57, 59]. The other individual Defendants, as Eric Miller told Rob Chase, were also "all in this together." [Robert Chase, pp. 58-59]. They participated in the processing of this order, releasing the ticket, and concealing it from Fastenal. They intended for it to be used in their new business, which clearly required interference with Fastenal's possession of the goods. [Eric Miller (during Plaintiff's case in chief), pp. 17-18]. Further, New River and Ashton, Jr., although not personally exercising authority over Fastenal's products, lent their name, address, and checkbook to Tri-State to facilitate the others in doing so. [Stewart Ashton, Jr. (during Plaintiff's case in chief), pp. 10-11, 27]. Their allegedly benevolent motive, intent, or purported good faith in helping out a friend are irrelevant. Clearly, Fastenal was entitled to recover on a theory of conversion.

The Tri-State Defendants further attempt to relieve themselves from liability by noting that the goods were not taken back by Fastenal. However, Fastenal had agreed to take back the goods as part of the Friday night agreement. Fastenal agreed to drop the criminal charges, if the Defendants returned the goods and agreed not to compete. Because the Defendants had agreed not to compete, Fastenal was willing to accept the enormous cost of moving this order—35,000 pounds—back through its distribution system. [Ross Surratt, pp. 22-23]. The Defendants did not honor this agreement, though. Moreover, the Defendants later changed their stories about who actually owned the goods. The Tri-State Defendants disclaimed ownership of the goods and said they belonged to New River. [Eric Miller (during Plaintiff's case in chief), pp. 41-43; Plaintiff's Trial Exhibit 5]. Ashton, Jr., initially told Ross Surratt that the goods were to be used in his coal

29

wash business, and then admitted that they were in fact to be used in Tri-State's new business. [Ross Surratt, pp. 35-36]. Ashton, Jr.'s affidavit tells yet another story. In the affidavit, which became a part of the Ashland Police Department file on this matter, Ashton, Jr. stated that he placed the order and intended to resell the items, but if not, he could use them in his coal wash plant. [Plaintiff's Trial Exhibit 8]. Clearly, Fastenal could not be expected to reach another agreement when (1) the first agreement was not honored by the Defendants, and (2) no one could apparently identify the owner of the goods or the purpose for which they would be used.

## II.  **Defendants are not entitled to a new trial nor remittitur.**

Alternatively, the Tri-State Defendants claim that they are entitled to a new trial. However, they have failed to satisfy the standard for a motion for a new trial. The Sixth Circuit has recognized that:

> [A] district court should grant a motion for new trial only when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e. the proceedings being influenced by prejudice or bias.

Mitchell v. Boelcke, 440 F.3d 300, 303 (6th Cir. 2006).

Along these same lines, the Tri-State Defendants also claim that the damages awards against them should be remitted. The Sixth Circuit has set forth an equally stringent standard for reducing a jury's verdict:

> As a general rule, this court has held that a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.
>
> A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the conscience of the court. If there is any credible evidence to support a verdict, it should not be set aside. The trial court

may not substitute its judgment or credibility determinations for those of the jury. Moreover, it abuses its discretion in ordering either a remittitur or a new trial when the amount of the verdict turns upon conflicting evidence and the credibility of the witnesses.

<u>Farber v. Massillon Board of Education</u>, 917 F.2d 1391, 1395 (6th Cir. 1990).

None of these criteria exists in this case.   As noted above, the verdict is entirely consistent and in line with the weight of the evidence.   The damages awards are not excessive in light of the value of the subject goods on the January 4, 2006 Invoice nor the lack of contrition displayed by the Defendants at trial.   Finally, the Tri-State Defendants have never alleged that the verdict resulted from bias or prejudice, or that the trial was unfair to them in any way.   Therefore, the jury verdict must stand.

**WHEREFORE,** Plaintiff Fastenal Company respectfully requests this Court to overrule the Defendants, Greg Crawford, Todd Robinson, Eric Miller, and Tri-State Industrial Supply's Motion for Judgment as a Matter of Law, for Judgment Notwithstanding the Verdict, for a New Trial, and/or Remittitur, and for any and all other relief to which it may be entitled.

Respectfully Submitted,

/s/ Leigh Gross Latherow
Gregory L. Monge
Leigh Gross Latherow
Keri E. Lucas
**VanANTWERP, MONGE,
JONES, EDWARDS & McCANN, LLP**
1554 Winchester Avenue - Fifth Floor
P.O. Box 1111
Ashland, KY 41105-1111
(606) 329-2929, (606) 329-0490 fax
ATTORNEYS FOR PLAINTIFF
FASTENAL COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2008, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to the following:   Hon. Michael S. Endicott and Hon. Sharon E. Rowsey.

/s/ Leigh Gross Latherow
COUNSEL FOR PLAINTIFF FASTENAL COMPANY