UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

FASTENAL COMPANY,                )
                                 )
            Plaintiff,           )        Civil Action No. 06-61-ART
                                 )
v.                               )
                                 )        **MEMORANDUM OPINION**
GREG CRAWFORD, et al.,           )          **AND ORDER**
                                 )
            Defendants.          )
                                 )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A jury returned a verdict in this matter on September 19, 2008, in Plaintiff Fastenal's favor. *See* R. 158. Defendants subsequently filed post-trial motions, which are now pending before the Court. The Defendants are divided into two groups: (1) Stewart Ashton, Jr. and New River Energy Resources, LLC (the "New River Defendants"), and (2) Greg Crawford, Todd Robinson, Eric Miller, and Tri-State Industrial Supply, Inc.(the "Tri-State Defendants"). In separate motions, both the New River Defendants and the Tri-State Defendants seek judgment as a matter of law under Fed. R. Civ. P. 50 on all claims, or, in the alternative, a new trial under Fed. R. Civ. P. 59.[1] The New River Defendants filed a Motion, R. 162, and Memorandum in Support, R. 194, to which Fastenal filed a Response, R. 166. The Tri-State Defendants filed a Motion, R. 164, and Memorandum in Support, R. 197, to which Fastenal filed Responses, R. 167, R. 195 and R. 198, and a Reply, R. 199, has been filed as well. In addressing the pending motions, the Court does not summarize all of the

---

[1] The parties sometimes use the phrases "directed verdict" or "judgment notwithstanding the verdict" rather than "judgment as a matter of law." Rule 50 was amended in 1991 to substitute "judgment as a matter of law," in place of the former terms. The Court will use Rule 50's current terminology.

voluminous evidence presented at trial in support of each of the counts, but rather just the facts necessary to support the jury's verdict.

## I.  BACKGROUND

This action arises out of the circumstances surrounding the decisions of Greg Crawford, Todd Robinson, and Eric Miller to quit their employment with Fastenal on January 5, 2006, and enter into the employment of Tri-State Industrial Supply shortly thereafter.  Fastenal alleged that Crawford, Robinson, or Miller placed an order for construction supplies on an account opened in the name of New River Energy Resources, R. 1 ¶ 16, of which Stewart Ashton, Jr. is an officer and owner, *id.* at ¶ 34.  The invoice for these supplies, dated January 4, 2006, was in the amount of $44,725.34, which Fastenal alleged was substantially reduced from what should have been charged. *Id.* at ¶ 17. Fastenal's records indicated that the supplies were supposed to be delivered to an address in Paintsville, Kentucky. *Id.* at ¶ 16.  Instead, on January 4, 2006, they were picked up and delivered to Tri-State Industrial Supply, *id.* at ¶¶ 23, 27, a competitor of Fastenal, *id.* at ¶ 28.

Fastenal reported these incidents on January 6, to the Ashland Police Department, which thereafter conducted an investigation. *Id.* at ¶ 41.  During the course of that investigation, Fastenal alleges that it entered into a settlement agreement with Crawford, Robinson, and Miller under which Fastenal would not seek their prosecution for theft in exchange for them returning the supplies and not competing with Fastenal's business.  *Id.* at ¶ 42.  Subsequent to these events, Crawford, Robinson, and Miller began working for Tri-State.  *Id.* at ¶ 27.

Based on the above, Fastenal filed suit on April 5, 2006, alleging several causes of action, including fraud, conversion, breach of fiduciary duties, misappropriation of trade secrets, breach of a Confidentiality and System Use Acknowledgment signed during Defendants' employment with

Fastenal, breach of the settlement agreement, and civil conspiracy. *Id.* at ¶¶ 48–63. A jury trial began on September 16, 2008, and the case was submitted to the jury on September 19, 2008. On that same day, the jury returned a verdict in Fastenal's favor, *see* R. 158, which is summarized below:

| Claim | Liability | Compensatory Damages | Punitive Damages | Total Damages |
|---|---|---|---|---|
| Civil Conspiracy | Crawford: Y<br>Robinson: Y<br>Miller: Y<br>Tri-State: Y<br>Ashton: Y<br>New River: Y | $100 k (joint and several) | $100 k<br>Crawford: $30 k<br>Robinson: $15 k<br>Miller: $15 k<br>Tri-State: $30 k<br>Ashton: $10 k<br>New River: $0 | $200 k |
| Fraud | Crawford: Y<br>Robinson: Y<br>Miller: Y<br>Tri-State: Y<br>Ashton: Y<br>New River: Y | $0 | $100 k<br>Crawford: $30k<br>Robinson: $15k<br>Miller: $15k<br>Tri-State: $30k<br>Ashton: $10k<br>New River: $0k | $100 k |
| Trade Secrets | Crawford: Y<br>Robinson: Y<br>Miller: Y<br>Tri-State: N | $80 k<br>Crawford: 50%<br>Robinson: 25%<br>Miller: 25% | Not sought | $80 k |
| Conversion | Crawford: Y<br>Robinson: Y<br>Miller: Y<br>Tri-State: Y<br>Ashton: N<br>New River: N | $124 k<br>Crawford: 16%<br>Robinson: 16%<br>Miller: 16%<br>Tri-State: 52% | $0 | $124 k |
| Breach of Fiduciary Duty | Crawford: Y<br>Robinson: Y<br>Miller: Y | $0 | Not sought | $0 |
| Violation of Confi Agrmt | Crawford: Y | $2 k | Not sought | $2 k |

| Claim | Liability | Compensatory Damages | Punitive Damages | Total Damages |
|-------|-----------|----------------------|------------------|---------------|
| Breach of Settlement Agrmt | Crawford: Y Robinson: Y Miller: Y | $0 | Not sought | $0 |
| **Totals** | | **$306 k** | **$200 k** | **$506 k** |

In their Rule 50 motions, the New River Defendants challenge the jury's verdict with respect to the civil conspiracy and fraud claims. *See* R. 194. The Tri-State Defendants challenge the jury's verdict on all claims, including breach of fiduciary duty and breach of the settlement agreement for which the jury did not assess any damages. *See* R. 197.

## II.   STANDARD

"Judgment as a matter of law will be granted only where 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (quoting Fed. R. Civ. P. 50(a)(1)). A court may grant judgment as a matter of law if, in viewing the evidence in the light most favorable to the nonmoving party, reasonable minds could only rule in favor of the moving party. *Id.* In reviewing a motion for judgment as a matter of law, a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

In a diversity case, however, when a Rule 50 motion for judgment as a matter of law is based on a challenge to the sufficiency of the evidence—as are some of Defendants' challenges—a court

-4-

should apply the standard of review used by the courts of the state whose substantive law governs the action–in this case Kentucky. *See Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 360 (6th Cir. 2006). Under Kentucky law, a motion for a directed verdict—the same thing as a motion for judgment as a matter of law under Rule 50—should be granted only if "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18–19 (Ky. 1998); *see also Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 231 (6th Cir. 1997). In reviewing a motion for a directed verdict under Kentucky law, "the trial judge must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion." *Bierman*, 967 S.W.2d at 18. Further, "[w]here there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts, as well as matters affecting the credibility of witnesses." *Id.* at 19.

Regarding Defendants' alternative request for a new trial, Rule 59(a) provides that motions for a new trial may be granted, in an action involving a trial by jury, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The Sixth Circuit generally has interpreted this provision to mean that a district court should grant a motion for a new trial only "when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *See Mitchell v. Boelcke*, 440 F.3d 300, 303 (6th Cir. 2006) (quotations omitted).

## III.   NEW RIVER DEFENDANTS

### A.   Fraud Claim

The jury found that the all of the defendants had committed fraud, *see* R. 158 at Instr. 21, and

awarded zero dollars in compensatory and $100,000 in punitive damages, of which the jury assigned 10% to Stewart Ashton Jr., and 0% to New River Energy. *Id.* at Instr. 33 & 34. The New River Defendants argue that an award of punitive damages in the absence of actual damages is improper under Kentucky law and violates the Due Process Clause. *See* R. 194 at 4–7.

   ***Is the Punitive Damages Award Proper Under Kentucky Law?*** Under Kentucky law, an award of compensatory damages is not a prerequisite to an award of punitive damages. As the highest court in Kentucky stated long ago, "[t]he correct rule, we think, is that if a right of action exists; that is, if the plaintiff has suffered an injury for which compensatory damages might be awarded, although nominal in amount, he may in a proper case recover punitive damages." *Louisville & Nashville R.R. Co. v. Ritchel*, 147 S.W. 411, 414 (Ky. 1912). The Kentucky Supreme Court has reiterated this rule in recent years as well. *See Commonwealth v. Vinson*, 30 S.W.3d 162, 166 (Ky. 2000) ("Where the plaintiff has suffered an injury for which compensatory damages, though nominal in amount may be awarded, the jury may in a proper case, award punitive damages as well."); *see also Roberie v. VonBokern*, No. 2004-SC-250-DG, 2006 WL 2454647, at *6 (Ky. Dec. 21, 2006) (referencing *Ritchel* and *Vinson* in rejecting an argument that the jury's failure to award compensatory damages barred an award of punitive damages and stating, "[t]he only requirement for punitive damages in this regard is that the injury be the sort for which compensatory damages, even if only nominal, are available."). Even the absence of a showing of actual damages need not bar an award of punitive damages. *Vinson*, 30 S.W.3d at 166 ("'[T]he fact that the jury returned a verdict for punitive damages only furnishes no just reason why the verdict should not be allowed to stand, since, under the rule in force in this state, punitive damages, when allowed, are given as compensation to the plaintiff, and not solely as punishment of the defendant.'" (quoting

-6-

*Ritchel*, 147 S.W. at 414)).  Here, compensatory damages were available for the fraud claim.  *See* R. 158 at Instr. 33 (indicating compensatory damages were available).  That is all that Kentucky law requires.

Contrary to the New River Defendants' contention, the fact that injury is an element of a plaintiff's prima facie fraud case under Kentucky law, *see United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999), does not alter this conclusion.[2]  As the Kentucky Supreme Court stated in *Vinson*, "compensatory damages are not an essential element of an intentional tort committed willfully and without justification.  The mere fact that no compensatory damages were awarded . . . does not mean that they did not have compensable injuries." *Vinson*, 30 S.W.3d at 166.  Thus, simply because the jury awarded no compensatory damages does not mean that Fastenal did not suffer an injury.  Indeed, because the jury instructions indicated that the value of the supplies sold to New River was a factor in calculating the damages for both conversion and fraud, *see* R. 158 at Instr. 24 & 33  the jury's award of damages on the conversion claim strongly suggests a factual basis existed for concluding that Fastenal suffered an injury as a result of Defendants' fraud.  *See Vinson*, 30 S.W.3d at 166 (noting that "there is a factual basis for a possible award of actual compensatory damages although not given in this case" in approving the punitive damage award).  The fact that the Defendants sold Fastenal product at a deeply discounted price to a direct competitor served as a basis for both the fraud and conversion claims. That the jury awarded compensatory damages for conversion only reflects, perhaps, the jury's foresight of not awarding duplicative damages, and not

---

[2] The New River Defendants also appear to make this argument as to the punitive damage award for the civil conspiracy claim.  *See* R. 164 at 4 ("Punitive Damages for Fraud Under Instructions 34 and 32 [civil conspiracy] Cannot Be Awarded . . . .").  To the extent that is the case, the argument is without merit because the jury awarded compensatory damages against the New River Defendants on the civil conspiracy claim.  *See* R. 158 at Instr. 31.

that Fastenal failed to suffer an injury.  Kentucky law, therefore, does not bar the jury's award of punitive damages on the fraud claim.

*Is the Punitive Damages Award Constitutionally Excessive?*  Apart from state law, the Due Process Clause limits punitive damages, and the New River Defendants, citing *BMW of North America, Inc., v. Gore*, 517 U.S. 559 (1996), contend that an award of punitive damages on the fraud claim violates these limits because the jury did not award compensatory damages.  *See* R. 194 at 7.  Under the Due Process Clause, the key question is whether the award is grossly excessive or arbitrary.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.").  In *State Farm*, the Court confirmed three guideposts for lower courts to use when considering the constitutionality of a punitive damage award that were initially enunciated in *BMW*.  *Id.* at 416–18.  Under these guideposts, a court's decision must be informed by: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id.* at 418.  In this case, the New River Defendants challenge only the disparity between the harm suffered and the punitive damages.  *See* R. 194 at 7.

There is a question as to how the Court should calculate the ratio of punitive to compensatory damages in cases with distinct punitive damage awards on individual claims, *i.e.*, should the court calculate a ratio for each claim by comparing the compensatory damages to punitive damages on a claim-by-claim basis or should it aggregate the compensatory damages on all claims against a particular defendant and compare those damages to the aggregate punitive damages against that

defendant.[3]  The Court has only found a few circuit cases analyzing the constitutionality of punitive damage awards on individual claims, and their results differ.  *Compare JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 874–77 (8th Cir. 2008) (analyzing the constitutionality of punitive damage awards for trespass and conversion claims separately), *with Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668 (6th Cir. 2005) (combining compensatory damages from separate claims when calculating ratio even though the punitive damage award was only for one claim), *King v. Macri*, 993 F.2d 294, 298–99 (2d Cir. 1993) (analyzing the constitutionality of punitive damage awards for excessive force, false arrest, and malicious prosecution claims on an aggregate basis), *and Roy Exp. Co. Establishment of Vaduz, Liech. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1107 (2d Cir. 1982) (analyzing the constitutionality of punitive damage awards for copyright infringement and unfair competition on an aggregate basis).

The issue is determinative of the constitutionality of the punitive damage award against Ashton on the fraud claim because the award would be unconstitutionally excessive if the ratio is calculated on a claim-by-claim basis, but it would be appropriate under an aggregate basis.  While the Supreme Court has declined "to impose a bright-line ratio which a punitive damages award cannot exceed," it also has stated, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *State Farm*,

---

[3] There is a second aggregation issue: whether a court computes the ratio on a defendant-by-defendant basis or whether it aggregates all awards against all parties.  The Court has found minimal case law on this issue, but finds persuasive a Ninth Circuit decision holding that in a multi-defendant action, "an approach that compares each plaintiff's individual compensatory damages with the punitive damages awards against each defendant more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 961 (9th Cir. 2005).

-9-

538 U.S. at 425. The High Court has explained the types of cases where punitive awards may permissibly exceed a single digit ratio—where a "particularly egregious act has resulted in only a small amount of economic damages" or where the "injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW*, 517 U.S. at 582. Based on these exceptions, circuit courts have allowed high ratios when a jury only awards nominal damages or a small amount of compensatory damages. *See Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 154 (4th Cir. 2008) (citing cases). Circuit courts have also upheld the constitutionality of punitive damages even where no compensatory damages were awarded, at least in 42 U.S.C. § 1983 cases. *See King*, 993 F.2d at 297–98 (citing cases). But because none of these exceptions apply to Ashton, a ratio of $0 compensatory damages to $10,000 punitive damages is unconstitutional. By contrast, on an aggregate level, the ratio becomes $100,000 in compensatory damages[4] to $20,000 in punitive damages, a more than constitutionally acceptable ratio.

Based on the Sixth Circuit's decision in *Pollard* and the Supreme Court's punitive damages precedent, the Court concludes that the aggregate calculation rather than a claim-by-claim calculation is the proper approach. The Supreme Court has stated that potential harm and potential damages can be taken into account when calculating the damages ratio. *See State Farm*, 538 U.S. at 424 (indicating that the ratio is "between harm, or potential harm, to the plaintiff and the punitive damages award"); *BMW*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and*

---

[4] Because Ashton is jointly and severally liable on the civil conspiracy award, the Court utilizes the entire award in calculating the ratio. *See Planned Parenthood*, 422 F.3d at 961, 971 (using defendant's joint and several liability in calculating ratio); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1024–25 (9th Cir. 1985) (same).

*potential* damages to the punitive award."); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.").  If a court is not limited to compensatory damages that actually occurred in calculating the ratio, it follows that a court is not confined only to the compensatory damages under particular claims and instead can look at damages found by a jury on related claims. *Cf. Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668 (6th Cir. 2005) (combining compensatory damages from separate claims when calculating ratio even though the punitive damage award was only for one claim).   Accordingly, *State Farm*, *BMW*, and *TXO* all suggest that a court can aggregate compensatory damages from multiple related causes of action when comparing compensatory damages to punitive damages.  When making such a comparison in this case, the ratio becomes constitutionally acceptable.  Further, while Ashton does not challenge the other guideposts, there is evidence of reprehensibility on his part because Ashton essentially admitted on the stand that he falsely swore to an affidavit, *see* R. 148 at 16–25 (admitting that he was acting as a bank and making a loan to help start up a new business whereas in the affidavit he said he purchased the items for resale), and evidence of trickery or deceit is indicative of reprehensibility, *see State Farm*, 538 U.S. at 419.  Therefore, the jury's award of punitive damages against Ashton on the fraud claim violates neither Kentucky law nor the Fourteenth Amendment.

### B.    Civil Conspiracy Claim

The New River Defendants attack the jury's verdict on the civil conspiracy claim on two grounds: (1) a stipulation between Fastenal and the New River Defendants precludes an award of

damages for civil conspiracy, R. 194 at 2, 7–9; and (2) civil conspiracy is not a separate and independent tort for which damages can be awarded, *id.* at 9.

On the last day of trial, Fastenal and the New River Defendants entered into a stipulation capping the amount of compensatory damages Fastenal sought from the New River Defendants.  It read as follows:

> It is stipulated by and between the Plaintiff, Fastenal Company, and the Defendants, Stewart Ashton, Jr., and New River Energy Resources, Ltd., as follows:
>
> That Plaintiff does not seek, and will not accept, compensatory damages from the Defendants, Stewart Ashton, Jr., and New River Energy Resources, Ltd., beyond the difference between the price listed on the January 4,2006 invoice, $44,725.34, and the published wholesale price for the goods on said invoice, $183,528.21, for a total of $138,802.87.
>
> This stipulation does not affect or limit in any way Plaintiff's ability to recover punitive damages from Defendants Stewart Ashton, Jr., and New River Energy Resources, Ltd.

R. 159.

The plain language of the stipulation demonstrates it does not affect the jury's award of $100,000 in compensatory damages against all Defendants (for which the New River Defendants are jointly and severally liable under the jury instructions, *see* R. 158 at Instr. 31) or its $100,000 award of punitive damages ($10,000 of which was assessed against Ashton and none against New River Energy).  The stipulation limited Fastenal to accepting a total of $138,802.87 in compensatory damages from the New River Defendants, but the $100,000 joint and several award for civil conspiracy represents the only compensatory damages assessed against them.  Similarly, the stipulation plainly states that it does not affect Fastenal's ability to recover punitive damages from

the New River Defendants.[5]  Thus, the jury's verdict regarding the New River Defendants in no way conflicts with the stipulation and thus does not preclude the award of damages for civil conspiracy against them.

The New River Defendants' second attack on the civil conspiracy damages award—that civil conspiracy is not a separate and independent tort—also fails.  Kentucky law clearly recognizes the tort of civil conspiracy.  *See Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995) (stating that a party must show an "unlawful/corrupt combination or agreement" between the conspirators "to do by some concerted action an unlawful act" to prevail on a civil conspiracy claim); *James v. Wilson*, 95 S.W.3d 875, 896–98 (Ky. Ct. App. 2002) (surveying Kentucky law on civil conspiracy); *see also Nat'l Info. & Commc'ns Equip. Network Inc. v. Willigan*, No. 06-28-DLB, 2007 WL 2979928, at *5 (E.D. Ky. Oct. 11, 2007) (indicating that Kentucky law recognizes a civil conspiracy cause of action); *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, No. 06-338-KSF, 2007 U.S. Dist. LEXIS 31313, at *17 (E.D. Ky. Apr. 16, 2007) (same).

Though somewhat cryptic, the New River Defendants' argument appears to be that the civil conspiracy claim is intertwined with the fraud claim.  Thus, according to the New River Defendants, because the jury awarded no compensatory damages for the fraud, there can be no civil conspiracy claim.  *See* R. 194 at 10 ("Without damages to the underlying fraud charge, there cannot be a civil conspiracy to commit fraud.").  But this argument fails to recognize that civil conspiracy is a separate tort from fraud under Kentucky law.  *See Stonestreet Farm, LLC*, 2007 U.S. Dist. LEXIS 31313, at *17 ("With respect to Stonestreet's claim of conspiracy, Sauque argues that this claim is by necessity

---

[5] Because the stipulation does not preclude the punitive damages award, the Court need not address whether the New River Defendants' alleged agreement to the jury instructions waived any challenge to punitive damages.

part of the fraud claim of Count One.  However, Kentucky courts recognize a separate cause of action for civil conspiracy . . . .").  Accordingly, it is inaccurate to state that the New River Defendants conspired to commit fraud.  Rather, the jury found they conspired "to accomplish an unlawful goal or accomplish a goal through unlawful means."  R. 158 at Instr. 20.  Moreover, while it is true that "unless something is actually done by one or more of the conspirators which results in damage, no civil action [for conspiracy] lies against anyone," *Davenport's Adm'x v. Crummies Creek Coal Co.*, 184 S.W.2d 887, 888 (Ky. 1945), the jury found the conspiracy caused damages to Fastenal, *see* R. 158 at Instr. 31.  Thus, the New River Defendants are not entitled to judgment as a matter of law on the civil conspiracy claim.

### C.  New Trial

In the alternative to their motion for a judgment as a matter of law, the New River Defendants request a new trial on the basis that the verdict is inconsistent on its face.  R. 194 at 10-11.  Specifically, New River Defendants challenge two verdicts: (1) the jury assessed punitive damages but not compensatory damages against the New River Defendants on the fraud claim, and (2) the jury found that they conspired to commit fraud but found no compensatory damages for the fraud.  R. 194 at 11.  However, the New River Defendants offer no arguments for why these verdicts are necessarily inconsistent.  While the Sixth Circuit has indicated that where verdicts in the same case are inconsistent on their faces, a motion to alter or amend a judgment or for a new trial is not discretionary, *see United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 457 (6th Cir. 2005), neither of the claimed inconsistencies bring the jury's verdict within this rule.

As discussed, the jury's decision to award punitive damages but not compensatory damages

for the fraud claim violates neither Kentucky nor federal law.  The New River Defendants have not suggested why awarding punitive damages but not compensatory damages is inconsistent.  Indeed, there are several plausible reasons for such a distinction, including to avoid awarding duplicative damages or an inability to quantify the damages flowing from the fraud, *see Roberie v. VonBokern*, No. 2004-SC-250-DG, 2006 WL 2454647, at *6 (Ky. Dec. 21, 2006) (stating that Kentucky cases "recognize that the direct impact of the tortuous conduct is sometimes difficult to quantify and may best be addressed by punitive damages").

The New River Defendants' claimed inconsistency between finding a conspiracy to commit fraud but assessing no compensatory damages for the fraud mistakenly combines the fraud and conspiracy claims.  As explained above, Kentucky law recognizes civil conspiracy as a separate cause of action.  A party, therefore, can participate in a conspiracy without committing fraud because a conspiracy requires only an "unlawful/corrupt combination or agreement" between the conspirators "to do by some concerted action an unlawful act," *Montgomery*, 910 S.W.2d at 239, not an agreement to commit fraud.  And in this case, the jury found they conspired "to accomplish an unlawful goal or accomplish a goal through unlawful means."  R. 158 at Instr. 20.  Therefore, the jury's verdict is not inconsistent, and thus, the New River Defendants are not entitled to a new trial.

### D.    Conclusion

As explained above, the New River Defendants' challenges to the jury award as it relates to them are without merit.  Accordingly, the Court will deny both their motion for judgment as a matter of law and their motion for a new trial.

### IV.   TRI-STATE DEFENDANTS

The Tri-State Defendants challenge the jury's verdict on all seven claims.  As such, the

Court will address their challenges claim-by-claim.

### A.     Breach of Settlement Agreement

Fastenal alleges that the Tri-State Defendants Greg Crawford, Todd Robinson, and Eric Miller entered into a settlement agreement on January 6, 2006. *See* R. 158 at Instr. 18. According to Fastenal, the agreement provided that the Defendants would return the goods identified on the January 4, 2006, invoice and not engage in a competing business, and in exchange Fastenal agreed not to pursue criminal charges against the Defendants. *Id.* The Tri-State Defendants deny that they entered into any such agreement. The jury found an agreement and breach, *see id.*, but awarded zero dollars in compensatory damages, *see id.* at Instr. 28.

The Tri-State Defendants challenge the jury's determination arguing Fastenal presented insufficient evidence to establish a breach of the settlement agreement. R. 197 at 2-6. According to Tri-State Defendants, the evidence presented at trial did not establish that a contract or settlement agreement had been entered into between Fastenal and Crawford, Robinson and Miller. *See* R. 197 at 4-6.

Under Kentucky law, a contract may be formed as long there is sufficient evidence to demonstrate a meeting of the minds between the parties. *See George Pridemore & Son, Inc. v. Traylor Bros., Inc.*, 311 S.W.2d 396, 397 (Ky.1958) ("If there is sufficient evidence to show a meeting of the minds . . . then a court or jury may be justified in finding a contract existed.); *see also Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987) ("A contract implied in fact is a true contract, shown by evidence of facts and circumstances from which a meeting of minds concerning the mutual promises may be reasonably deduced."). To constitute a binding contract, minds of parties must meet, and one cannot be bound by a contract to which he was not party, nor by

-16-

uncommunicated terms without his consent. *Harlan Pub. Serv. Co. v. E. Const. Co.*, 71 S.W.2d 24, 29 (Ky. 1934).

When viewing the evidence in a light most favorable to Fastenal, there was sufficient evidence presented at trial to support the jury's finding regarding a breach of settlement agreement. *See* R. 192 at 38, 62, 134-138 (Surratt's Testimony); R. 185 at 90-93, 100-102 (Chase's Testimony). For example, Fastenal Regional Vice-President Surratt testified that he spoke to Greg Crawford on Friday evening, explaining, "Greg, you have two options, continue with criminal charges or you have this option of bringing the product back Monday morning and you guys signing a non-compete agreement, and this thing will be done." R. 192 at 38. According to Surratt, Greg responded "We'll sign the agreement." *Id.*

Robert Chase testified that he telephoned Todd Robinson the following day and told him, "We can make this thing go away from a criminal standpoint, but you have to agree to the terms that you agreed to last night. And it was crystal clear what those terms were that they were going to return the product and not compete against us for dropping criminal charges." R. 185 at 92. According to Chase, Robinson agreed that he would be there Monday morning and he wanted the matter to "go away." *Id.* Robinson confirmed that he did speak with Chase on Saturday morning and that Chase asked him about returning the goods and signing non-compete agreements. R. 186 at 18-19. However, Robinson denies that he agreed to be there Monday. *Id.* Obviously, the jury did not believe Robinson–an issue strictly within the jury's province. *See Bierman v. Klapheke*, 967 S.W.2d 16, 19 (Ky. 1998) ("Where there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts, as well as matters affecting the credibility of witnesses.").

Miller, however, is another story. He spoke to neither Chase nor Surratt. Miller testified that

-17-

he was with Greg Crawford on Friday evening, but that he did not have any knowledge of the conversation that occurred between Crawford and Surratt. R. 182 at 7. Rather, Miller indicated that the first time he learned that he had been requested to sign a non-compete was the following Saturday. *Id*. Miller spoke to Greg on the telephone, explaining "he told me that there was something said about returning the product on Monday and they wanted to discuss some documents." *Id*. at 7-8. He never testified that he was going to enter into the agreement. No one else testified that he made such a commitment. Indeed, in Fastenal's entire brief they fail to point to a single piece of testimony that supports their argument that Miller agreed to enter into such an agreement. Thus, the claim against Miller must fail.

In conclusion, evidence existed from which the jury could conclude that an agreement existed between Fastenal and Tri-State Defendants Crawford and Robinson. However, there was no affirmative evidence with respect to Defendant Miller with regard to this claim.

### B.    Breach of Fiduciary Duty

The Tri-State Defendants argue there was no evidence presented at trial that Eric Miller, Greg Crawford, and Todd Robinson breached their fiduciary duties while employed at Fastenal. R. 197 at 7-11. In order to prevail on a claim for breach of fiduciary duty, the plaintiff must prove: (1) the defendant owes a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered damages as a result of the breach. *Sparks v. Re/Max Allstar Realty, Inc*., 55 S.W.3d 343, 348 n.15 (Ky. Ct. App. 2000). "Under Kentucky law, a fiduciary relationship is 'founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to *act primarily for another's benefit* in matters connected with such undertaking.'" *Sallee v. Fort Knox Nat'l Bank,*

-18-

*N.A.*, 286 F.3d 878, 892 (6th Cir. 2002) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc*., 807 S.W.2d 476, 485 (Ky. 1991)).

The employer and employee relationship is a well recognized fiduciary relationship. *See Henkin , Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 423 (Ky. App. 1978) (listing common forms of fiduciary relationship). It is undisputed that all three defendants testified that they were employees of Fastenal. *See* R. 152 at 3 (Crawford's testimony), R. 151 at 5 (Miller's testimony), R. 186 at 3 (Robinson's testimony). Indeed, Robert Chase testified that Greg Crawford had been the Ashland branch manager for 11 years and was "ultimately responsible for every facet of the business." R. 185 at 10-11. Chase further testified that Fastenal considered all three employees Crawford, Robinson and Miller to be in positions of trust. R. 185 at 32, 36, & 39.

Moreover, Fastenal presented an abundance of evidence that these three defendants breached their fiduciary duty. Indeed, it was the main focus of the entire trial. For example, Fastenal introduced evidence that all three of them worked to set up a competing business, supplied that business with Fastenal's own products, and did so at a substantially-reduced, below market price. While there was voluminous and compelling evidence of this at trial–including in part the Defendants' own testimony–the Court will not reiterate all of it here. Ross Surratt's testimony alone was enough for the jury to find for Fastenal. Surratt testified to his knowledge of the "very unusual" invoice and order for $44,000 worth of product that was placed on January 4, 2006. R. 192 at 28-29. Ultimately, this order proved detrimental to Fastenal because it was such a large order, sold to a new unknown customer, for a substantially low cost. R. 192 at 18-31 (Surratt's testimony). He went on to describe the transaction, "not only did [Fastenal] have a loss on this but [Fastenal] gave up a lot of profit that [they] typically make as well." R. 192 at 42-43. In short, like the jury, the Court found

-19-

Fastenal's evidence compelling on this point.  Therefore, the Tri-State Defendants challenge as to the breach of fiduciary claim must fail.

### C.    Civil Conspiracy

Additionally, the Tri-State Defendants allege that judgment as a matter of law is appropriate because civil conspiracy is not an individual tort for which separate damages can be awarded.  R. 197 at 12.  While recognizing that not all jurisdictions permit civil conspiracy claims, this Court has specifically stated that Kentucky courts recognize a separate cause of action for civil conspiracy.  *See* infra part III-B for discussion of applicable case law.

Defendants also argue that there was no evidence that any of the Defendants conspired to injure Fastenal because Plaintiff did not present proof of any unlawful act or agreement to commit an unlawful act. R. 197 at 13-14.  To prevail on a claim of civil conspiracy under Kentucky law Fastenal was required to prove the Tri-State Defendants entered into an agreement to commit an unlawful act.  *See Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995) (stating that a party must show an "unlawful/corrupt combination or agreement" between the conspirators "to do by some concerted action an unlawful act" to prevail on a civil conspiracy claim) (citing *McDonald v. Goodman*, 239 S.W.2d 97, 100 (Ky. Ct. App. 1951)). "Concerted action" means some "overt act done pursuant to or in furtherance of the conspiracy." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002) (citing *Davenport's Adm'x v. Crummies Creek Coal Co.*, 184 S.W.2d 887, 888 (Ky. 1945)).

Contrary to Defendants' assertion, there was ample evidence from which a jury could conclude that the Defendants entered into an agreement to commit an unlawful act—i.e., to convert Fastenal's product and/or defraud Fastenal—and took steps in this regard.  It was completely

reasonable for the jury to infer that Crawford, Robinson, and Miller entered into an agreement to take Fastenal's product at a substantially reduced price and start up a new business that would directly compete with Fastenal. Indeed, Fastenal's entire presentation of evidence focused on this. The Defendants, however, claimed at trial that they never agreed to go into business until after the sale of the product. *See* R. 152 at 26-29 (Crawford's Testimony); R. 186 at 8 (Robinson's testimony); R. 151 at 13 (Miller's Testimony). Specifically, Crawford testified as follows:

> Q.    When did you begin formulating specific plans to leave, Greg?
> A.    I did not.
> Q.    You did not form any specific plans to leave? You left?
> A.    I was leaving -- January 4th is whenever they asked me to come down after work.
> Q.    All right. So, January 4th, Troy Bruner came to Fastenal and said, hey, I want to have a meeting with you; is that right?
> A.    Yes.
> Q.    Now, at this point Troy had already picked up this product, correct?
> A.    Yes, I believe he had.

R. 152 at 26. And, Todd Robinson testified:

> Q.    So you knew before the meeting with the Bruners, the first meeting with the Bruners, that they had gotten this inventory and it was for there competing business?
> A.    I really don't know. I don't know.
> Q.    Well, you must have known it before because you said you weren't surprised when you saw it, right?
> A.    Yeah.
> Q.    If you had not been told that already you would have questioned what is this product doing here, I thought it was for a coal company, right?
> A.    I didn't at the time when I met with the Bruners that day I think we were in the front office and I don't even know that I even paid any attention to it."

R. 186 at 15.

The jury rejected their testimony as it was free to do. Indeed, Defendants' assertion was illogical in light of the remaining evidence. For example, why would Crawford lie about whom he sold

-21-

Fastenal's products if it was a legitimate sale?  Crawford told Chase that he sold the product to a coal company in Paintsville at an extremely low price.  In reality, Crawford knew he was selling the product to his partner, Troy Bruner.  *See*, *e.g.*, R. 152 at 27.[6]  Moreover, if it was a legitimate sale, why not just identify Bruner on the invoice rather than a coal company that had no legitimate use for the product?

And, immediately after the sale of Fastenal's product, all three employees—Crawford, Robinson and Miller—gave notice, left Fastenal and began working for Tri-State.  *See* R. 152 at 83 (Crawford's Testimony); R. 186 at 8 (Robinson's Testimony); R. 151 at 4, 11 (Miller's Testimony). Again, this was not just a coincidence.  Indeed, the jury heard testimony that the Tri-State Defendants were all trusted and responsible long-term employees of Fastenal.  Crawford was employed the longest, for eleven years, and both Robinson and Miller had been there for nine years each.  *See* R. 152 at 11 (Crawford); R. 186 at 3 (Robinson); R. 151 at 5 (Miller).  The timing of events simply did not make sense compared to their long history with Fastenal.  In fact, the scenario they offered was implausible: that they delivered a deeply discounted product to a direct competitor, were offered employment that very evening from that same competitor, and then gave notice at Fastenal over the next two days.  Notably, these employees did not even serve a two-week notice period, they left immediately. It is completely reasonable for a jury to reject their testimony and draw their own conclusions from this suspect timing of events.  The jury brought common sense to the courtroom and was entitled to use it.  In short, there was sufficient evidence for the jury to conclude the Tri-State Defendants entered into a conspiracy.

Finally, Defendants also allege that because the jury did not find any damages related to the

---

[6] The sale of the product constituted an overt act in furtherance of their agreement.

underlying fraud charge there cannot be a conspiracy to commit fraud.  R. 197 at 16. Similar to the argument made by the New River Defendants, the Tri-State Defendants appear to argue that because the conspiracy claim is intertwined with the fraud claim it cannot stand.  Just as this Court found with respect to the New River Defendants, it is inaccurate to state that the Tri-State Defendants conspired to commit fraud.  Rather, the jury found they conspired "to accomplish an unlawful goal or accomplish a lawful goal through unlawful means,"  R. 158 at Instr. 20, and the jury found the conspiracy caused damages to Fastenal.  *Id.* at Instr. 31.  Therefore, the Tri-State Defendants are not entitled to judgment as a matter of law on the civil conspiracy claim.

        **D.    Fraud**

        The jury found that the Tri-State Defendants had committed fraud, *see id.* at Instr. 21, and awarded zero dollars in compensatory and $100,000 in punitive damages, of which the jury assigned 30% to Crawford, 15% to Robinson, and 15% to Miller, and 30% to Tri-State, *id*. at Instr. 33 & 34. The Tri-State Defendants argue that there is no evidence that Crawford, Miller and Robinson engaged in any fraudulent activities with regard to Fastenal.  R. 197 at 16-19.

        In a Kentucky action for fraud, the party claiming harm must establish six elements by clear and convincing evidence as follows: (1) material representation, (2) which is false (3) known to be false or made recklessly, (4) made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury.  *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (citing *Wahba v. Don Corlett Motors, Inc*., 573 S.W.2d 357, 359 (Ky. App. 1978)).

        The Tri-State Defendants appear to argue that Fastenal did not prove the first element of fraud because the Defendants did not make any representation to Fastenal.  R. 197 at 17.  The Tri-State Defendants concede Greg Crawford gave a quote to a direct competitor with a very low margin

-23-

but argue that he did not mislead Fastenal. *Id*. at 17-18.  In addition, Tri-State argues that Fastenal had a duty to investigate the large order taken at the Ashland branch and because they did not do so they should not have been able to pursue fraud as a cause of action in this case. *Id.* at 18.

When viewing the evidence in a light most favorable to Fastenal, there is ample evidence to support the jury's determination as to fraud. *Cf. Bierman*, 967 S.W.2d at 18. Chase testified that Crawford intentionally told him that he "had to go very low to get the order" and the specific order in question was for a new coal business in Paintsville. *See* R 185 at 46 (Chase's Testimony).  The next day Crawford tendered his resignation to Chase. *Id* at 50-51.  Crawford's resignation was immediately followed by both Robinson and Miller. *Id* at 57-58.  Miller told Chase "[w]e're all leaving" and "[w]e're all in this together." *Id* at 58.  After the three employees were gone Chase then did some "digging" and discovered the January 4, 2006, invoice. *Id.* at 69.

Crawford's testimony also supports Chase's version of events.  R.152 at 23-59 (Crawford's Testimony).  Crawford testified that when he placed the order he knew that it was going to a direct competitor, Troy Bruner, but that he intentionally typed in the name of New River Energy on the January 4, 2006, invoice. *Id* at 33.  Contrary to Tri-State Defendant's assertions, Crawford's own testimony makes clear that he knew he was making an intentional misrepresentation, the first element of the fraud claim, to his employer Fastenal.  He also admitted that he told Rob Chase the order was for a coal company in Paintsville, Kentucky. *Id*. at 59.  Thus, Fastenal presented sufficient evidence to substantiate its fraud claim. *Cf. Bierman*, 967 S.W.2d at 18–19.

### E.    Punitive Damages

The jury awarded Fastenal $100,000 in punitive damages on both the civil conspiracy and fraud claims, for a total of $200,000 in punitive damages.  The Tri-State Defendants challenge the

-24-

award on the ground that the guideposts from *BMW* and *State Farm* used to review punitive damage awards, particularly the reprehensibility factor, demonstrate that the award is unconstitutional. Based on the Supreme Court's three guideposts—the degree of reprehensibility of the defendant's misconduct, the disparity between the plaintiff's harm and the punitive damages, the difference between the punitive damages and the civil penalties in comparable cases, *see State Farm*, 538 U.S. at 418—the Court concludes that the punitive damage award is constitutional.

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575. The Supreme Court has instructed courts to determine the reprehensibility of a defendant by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.* Because it is presumed that a plaintiff is made whole for its injuries through compensatory damages, "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

Only one of these factors is present in this case—the harm was the result of intentional malice, trickery, or deceit. Crawford intentionally misled Chase by telling him that the order was for a new coal company in Paintsville, Kentucky. *See* R. 152 at 57, 59 (Crawford's Testimony); R. 185 at 46 (Chase's Testimony). Evidence of trickery or deceit is indicative of reprehensibility. *See State*

-25-

*Farm*, 538 U.S. at 419.

None of the other factors are present.  The harm in this case was purely economic and did not threaten the health or safety of others and Fastenal does not argue otherwise.  No evidence exists that Fastenal is a  financially vulnerable victim.  They had an average growth rate of twenty percent a year and were increasing stores. *See* R. 192 at 25, 48 (Surratt's Testimony). While Fastenal argues that its Ashland store was financially vulnerable, that does not translate into financial vulnerability for Fastenal, the Plaintiff in this case.  Finally, there is no evidence that the Tri-State Defendants' conduct in this case were one of a repeated number of actions.  The Sixth Circuit has interpreted the repeated conduct factor as requiring "'that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff.'"  *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 1000 (6th Cir.2007) (quoting *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 356 (6th Cir. 2005)).  Here, Fastenal argues that this factor is met because, though there was only one sale of goods, the Tri-State Defendants have "continued to reap the benefits of the goods and the information they obtained from Fastenal."  R. at 20**.**  However, this behavior by the Tri-State Defendants does not constitute similar reprehensible conduct committed against different parties and thus this factor does not weigh in favor of a punitive damage award.

The Sixth Circuit has stated, "where only one of the reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 is all that due process will allow."  *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487 (6th Cir. 2007); *see also Bach*, 149 F. App'x at 356.  The Sixth Circuit has adopted the Supreme Court's warning that the "existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award," *State Farm*, 538

-26-

U.S. at 419. *Chi. Title Ins. Corp.*, 487 F.3d at 1001. After reviewing the evidence, the Court concludes that the Tri-State Defendants' actions were sufficiently reprehensible to impose some amount of punitive damages–they misled their employer, set up a competitor, took goods at below market price, and sold the goods to the employer's clients. Further, the amount of punitive damages is reasonable. Whether calculated as a group (the Tri-State Defendants: $180,000/$306,000) or individually (Tri-State: $60,000/$164,480; Crawford: $60,000/$161,840; Robinson: $30,000/$144,840; Miller: $30,000/$144,840), the ratios of punitive damages to compensatory damages are below the 1:1 to 2:1 ratios that are the outer bounds of due process where only one reprehensibility factor is present.

Lastly, the punitive damage awards in cases involving claims of fraud and civil conspiracy also demonstrate that the punitive damage awards are reasonable. *Cf. EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 516–17 (6th Cir. 2001) (considering punitive damage awards in comparable cases when analyzing the reasonableness of the punitive damages awarded in the instant case). For example, in *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999), the Kentucky Supreme Court upheld a $1 million punitive damage award based on claims of fraud and promissory estoppel. *Id.* at 467, 470. Though there is limited Kentucky law on civil conspiracy, Kentucky courts have upheld punitive damages for civil conspiracy claims. *See Dist. Union Local 227 v. Fleischaker*, 384 S.W.2d 68, 70, 73 (Ky. 1964) (upholding $50,000 punitive damage award for civil conspiracy claim).

The Tri-State Defendants also challenge the jury's $100,000 punitive damage award on the fraud claim on the same grounds as did the New River Defendants, *i.e.*, that Fastenal did not establish a prima facie case of fraud without actual damages and that the punitive damage award is

unconstitutionally excessive given that the jury did not award compensatory damages on the fraud claim. These challenges also fail.

The Court has previously rejected the argument that Fastenal failed to establish a prima facie fraud claim. Thus, based on the Kentucky Supreme Court's decision in *Vinson*, the fact that the jury did not award compensatory damages does not necessarily mean that Fastenal did not suffer an injury. *See Vinson*, 30 S.W.3d at 166. Indeed, the jury's verdict suggests otherwise, as explained above. Additionally, the jury's punitive damage award for the Tri-State Defendants' fraud is not constitutionally excessive. As explained above, the Court aggregates all the damages against the individual defendants when calculating the compensatory-punitive damages ratio rather than computing it on a claim-by-claim basis. Calculating the ratios in that fashion reveals no constitutional issue with the size of the punitive damage award on the fraud claim.

### F. Trade Secrets

The jury found that Defendants Crawford, Robinson and Miller misappropriated trade secrets, R. 158 at Instr. 15, and awarded $80,000 dollars in compensatory damages, of which the jury assigned 50% to Crawford, 25% to Robinson, and 25% to Miller, *id*. at Instr. 26. The Tri-State Defendants argue that Plaintiff has failed to provide evidence that would permit a reasonable juror to find that Defendants misappropriated trade secrets from Fastenal because Fastenal failed to identify any information that was identifiable as a trade secret. R. 197 at 25.

Kentucky statutory law governs misappropriation of trade secrets, based on the Uniform Trade Secrets Act, which defines a trade secret as information that derives economic value "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can readily obtain economic value from its disclosure or use." *ATC Distribution Group, Inc.*

-28-

*v. Whatever It Takes Transmission & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005) (citing Ky. Rev. Stat. Ann. § 365.880). Whether a particular type of information constitutes a trade secret is a question of fact. *KCH Servs., Inc. v. Vanaire, Inc.*, No. 05-777-C, 2008 WL 4401391, at *2 (W.D. Ky. Sept. 24, 2008). Kentucky courts have not specifically addressed whether a customer list constitutes a trade secret. However, the Sixth Circuit has offered guidance to courts in determining what information constitutes a trade secret by whether the information is readily obtainable. *See ATC*, 402 F.3d at 714 (discussing case law). "[C]ourts generally distinguish between, on one hand, lists of customers discoverable only through extraordinary efforts and . . . through many years' expenditure of time and money, . . .and, on the other hand, lists of customers whose identities as purchasers of a given type of product may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses." *Id.* at 714 (Internal citations omitted).

There were numerous assertions as to information of economic value that constituted trade secret information such as pricing and customer sales information. With regard to economic value, Surratt testified that it had taken nearly forty years of cultivating relationships in the marketplace to establish its prices that were unknown to its competitors. *See* R. 192 at 26 (Surratt's Testimony). This information is not generally known or readily ascertainable by proper means and was considered confidential information. *See* R. 185 at 28 (Chase's Testimony). Chase testified that Crawford, as the Ashland branch manager, had access to customer sales information, account payable information, internal customer usage reports that track sales patterns *Id.* at 18-19, & 30. Further, this information was the subject of reasonable efforts to maintain its secrecy because it was only available through internal usage reports that were accessible by Fastenal employees. *Id.* at 18, 26, & 35.

Crawford testified that as an employee at Fastenal he had access to confidential information such as internal usage reports that included information such as costs and customer lists. R. 152 at 70-71. In addition, he was required to sign a confidentiality agreement that demanded he keep information confidential. *Id.* at 72-76; Plaintiff's Trial Exhibit 10. The confidentiality agreement, signed by Crawford, stated in pertinent part "Employee acknowledges that the company has taken reasonable measures to preserve the secrecy of its confidential information, including the signing of this acknowledgment. It is understood that you will not during or after the term of your employment disclose to third parties or use for your own benefit the company's confidential information." *Id.* at 76. Defendants Robinson and Miller also testified that they had access to confidential information while employed at Fastenal. *See* R. 186 at 5-6 (Robinson's Testimony); R. 151 at 31-32 (Miller's testimony).

"The defendants misappropriated a trade secret if they used it without proper consent, if the trade secret was disclosed improperly, or if it was acquired through improper means." *KCH Services*, 2008 WL 4401391 at *4; *see* KRS § 365.880. As Crawford's own testimony indicates, the employees had access to confidential information, signed confidentiality agreements with Fastenal, and ultimately used this information for their own benefit**,** including targeting potential new customers. Indeed, the Defendants themselves testified they have generally the same responsibilities at Tri-State that they did while employed at Fastenal, and that they targeted and retained some of the same customers. *See* R. 186 at 20-21 (Robinson's Testimony); R. 151 at 26-31 (Miller's Testimony).

Fastenal presented sufficient evidence for a jury to find the Defendants misappropriated a trade secret. Accordingly, the Defendants' challenge to the jury's verdict regarding this claim fails.

-30-

### G.   Breach of Confidentiality Agreement

The jury found that the Defendant Crawford breached his confidentiality agreement, R. 158 at Instr. 17, and awarded $2,000 dollars in compensatory damages, *id*. at Instr. 27.  The Tri-State Defendants argue that Fastenal, through the testimony of Robert Chase, admitted that no documents or items were removed from the premises by Crawford, therefore, there could have been no breach of the confidentiality agreement.  R. 197 at 26.

The evidence is un-controverted that Crawford, while employed at Fastenal, signed a Confidentiality and System Use Acknowledgment Form.  *See* R. 152 at 72-76 (Crawford's Testimony).  According to this agreement, it prevents employees from disclosing information such as, "company market strategies, business plans, trade secrets, potential business opportunities, procedures or processes, personnel and compensation information, customer or vendor information or contacts, prospect information, financial data, cost and sales data, source codes or programming techniques."  *Id.* at 80.  Contrary to Defendant's argument the agreement, by its express terms, does not apply to merely tangible items.

Further, there was evidence that Crawford has access to this confidential information and breached this agreement when he left Fastenal and began working for a direct competitor.  Crawford testified that he had access to confidential information, as specified in the agreement, such as personnel and compensation, pricing information, and costs and sales data.  *Id.* at 81-82. In addition, Crawford said he understood that by signing this agreement it was important to Fastenal to keep this information secret.  *Id.* at 82.  He also admitted that this type of information would be helpful in starting a new business.  *Id*. at 81.  Indeed, that is exactly what he did–he began working for a new direct competitor, selling identical product and competing for the same customers.  *Id.* at 84-85.

-31-

Given Crawford's testimony acknowledging the agreement and its importance, his access to the information and subsequent employment, it cannot be said that there was an absence of proof as to breach of confidentiality agreement. Therefore, Defendant's challenge to the jury's verdict on the claim of the breach of the confidentiality agreement fails.

### H.    Conversion

The jury found the Defendants were responsible for conversion of Fastenal's property, R. 158 at Instr. 14, and awarded $124,000 dollars in compensatory damages, *id*. at Instr. 24. The jury allocated fault as follows: 16% to Crawford, 16 % to Robinson, 16 % to Miller and 52% to Tri-State. *Id*. at Instr. 24.

A cause of action for conversion in Kentucky requires proof of seven elements: (1) plaintiff has legal title to the converted property; (2) plaintiff had possession or the right to possession at the time of conversion; (3) defendant exercised dominion over the property, to defendant's use and enjoyment, such that plaintiff's right to use and enjoy the property was denied; (4) defendant intended to interfere with plaintiff's possession; (5) plaintiff made some demand for the property's return which defendant refused; (6) defendant's action caused plaintiff's loss of the property; and (7) plaintiff was damaged thereby. *Ky. Ass'n of Counties v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005) (quoting 90 C.J.S. Trover and Conversion § 4 (2004)); *Meade v. Richardson Fuel, Inc.*, 166 S.W.3d 55, 58 (Ky. Ct. App.2005). The Tri-State Defendants primary challenge to the conversion claim is that Fastenal did not prove element five because Fastenal did not make a demand for the property's return. R. 197 at 27.

Contrary to the Tri-State Defendant's arguments, there is evidence in the record to satisfy a demand for property under element five to prove the claim of conversion. Ross Surratt testified that

-32-

his recollection from that Friday evening was that he would be willing to drop criminal charges in exchange for the goods being brought back first thing Monday morning. *See* R. 192 at 37-38 (Surratt's Testimony). At trial, according to Crawford, he told Surratt he would give the product back in order to appease Fastenal and meet with him on Monday morning. R. 152 at 106-07; 110-112 (Crawford's Testimony). Counsel for Fastenal specifically asked Crawford at trial, "you [k]new that Ross Surratt had demanded two things, one, to return the product, and two, to not compete against Fastenal ever again. You knew that on Friday night?" *Id.* at 112. Crawford responded, "I knew that he asked for it, yes." *Id*. The Defendants did not return the product in response to this request. Thus, it cannot be said that Fastenal failed to prove element five of conversion–demand for the property's return. The Tri-State Defendants arguments challenging the jury's verdict as to the claim of conversion is without merit.

## I.     New Trial and/or Remittur

The Tri-State Defendants Motion, R. 197, is styled Motion for Judgment as Matter of Law or in the Alternative Motion for New Trial and/or Remittur. However, no arguments were put forth to support their argument for a Motion for New Trial. The Tri-State Defendants do raise this issue in their reply brief, R. 199. However, issues may not be raised in district court for the first time in a reply brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (finding "issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses.").

Nonetheless, even assuming this issue was properly before the Court it is also without merit. Defendants argue that the verdict was against the great weight of evidence and damages were excessive and improper because "the damages claimed were not derived from any information of lost

sales . . . ."  R. 199 at 23.  As a general rule, a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.  *Farber v. Massillon, Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990).  "The trial court may not substitute its judgment or credibility determinations for those of the jury."  *Id.*

Even considering the Tri-State Defendants arguments, the damages in this case are not excessive.  Surratt testified at trial that applying the correct calculations of the full published wholesale price to the order and invoice in question Fastenal would have arrived at a figure of $183, 528.21.  R. 192 at 15, Plaintiff's Trial Ex. 6.  In addition, Surratt testified that after the loss of the product in January 2006 the Ashland Branch suffered a decline of approximately $242,000 of sales per quarter in 2006 and 2007.  *Id.* at 46.  The jury awarded $306,000 in total compensatory damages and $200,000 in punitive damages.  It was not unreasonable for the jury to reach these estimates based on the testimony offered at trial.  Therefore, the Court will decline to find in favor of the Tri-State Defendants on this Motion.

-34-

## V.    CONCLUSION

For the reasons given above, it is **ORDERED** as follows:

(1)    New River Defendants' Motions for Judgment as a Matter of Law, R. 162 & R. 194, are **DENIED.**

(2)    Tri-State Defendants Motions for Judgment as a Matter of Law, R. 164 & R. 197, are **DENIED** in part and **GRANTED** in part solely with respect to Defendant Miller regarding the breach of settlement agreement claim.

This the 26th day of February, 2009.

Signed By:

*Amul R. Thapar*  AT

**United States District Judge**